PAGELSDORF, and wife, Plaintiffs-Appellants, v. SAFECO INSURANCE COMPANY OF AMERICA, and another, Defendants-Respondents.

Supreme Court

*No. 76–229. Submitted on briefs September 12, 1979.— Decided October 9, 1979.*
(Also reported in 284 N.W.2d 55.)

For the appellants the cause was submitted on the briefs of *Larry B. Brueggeman, Virginia M. Antoine* and *Goldberg, Previant & Uelmen, S.C.,* of Milwaukee.

For the respondents the cause was submitted on the briefs of *Douglas J. Carroll* and *Arnold, Murray, O'Neill & Schimmel* of Milwaukee.

WILLIAM G. CALLOW, J.   We dispose of this appeal by addressing the single issue of the scope of a landlord's duty toward his tenant's invitee who is injured as a result of defective premises.   Abrogating the landlord's general cloak of immunity at common law, we hold that a landlord must exercise ordinary care toward his tenant and others on the premises with permission.

The defendant Richard J. Mahnke owned a two-story, two-family duplex.   There were four balcony porches: one in front and one in back of each flat.   Mahnke rented the upper unit to John and Mary Katherine Blattner who lived there with their three children until Mr. Blattner left the family.   Mahnke and his wife lived in the lower unit.   The Blattners held the flat under an oral lease which included an agreement that Mahnke would make all necessary repairs on the premises.   Mahnke worked as a mechanic for Wisconsin Electric Power Company and considered himself a good handyman.

All the railings on the porches were originally wooden, but Mahnke had begun to replace them with wrought iron as the wooden railings began to deteriorate.   By May 10, 1974, wrought iron railings had been placed on the

lower back porch, but the wooden railing on the upper back porch had not been replaced. The wooden railing consisted of 2 x 4's running parallel to the floor of the porch connected by 2 x 2 spacers running perpendicular to the floor. The railing sections were approximately 3 feet from top to bottom and were between 4 and 6 feet long. They were attached to upright 4 x 4's by means of nails driven at approximately a 45° angle; none of them were held in place by screws, bolts, or braces.

Mr. Blattner left the family, and in April, 1974, Mrs. Blattner left the apartment and moved with her children to Kansas. She left her furniture in the apartment and paid her rent for the month of May, having arranged with the Mahnkes to have her brothers move the furniture on May 11. On May 10, 1974, Mrs. Blattner's two brothers arrived to move her belongings to Kansas. They rented a truck and parked it behind the duplex. While moving the furniture out of the duplex, they felt they would need help with the heavier items. They asked Carol Pagelsdorf, a next-door neighbor who had been packing Mrs. Blattner's belongings, to ask her husband James to help them. He agreed to help.

While moving the bedroom furniture, Pagelsdorf and one of Mrs. Blattner's brothers felt that the box spring was too cumbersome to be taken down the back stairway. The Blattner brother decided that the best way to remove it from the apartment would be to lower it from the rear balcony to the ground. Pagelsdorf and a Blattner brother went out on the porch and visually inspected it for safety, but Pagelsdorf did not touch or shake the railings before taking the box spring out. The railings, which had been painted by Mahnke within the past two years, appeared safe. The Blattner brother and Pagelsdorf took the box spring out onto the balcony and leaned it on a railing section. They picked up the spring and leaned over the railing while passing it down to the

other brother. While letting the spring down, Pagelsdorf applied pressure straight down on the railing with his body. After both men released the box spring, Pagelsdorf began to straighten up, placing his hands on the railing, and bending his knees slightly. His knees then touched the 2 $\times$ 2 spokes in the railing, and the bottom swung out as if on a hinge. The entire railing section came loose, and Pagelsdorf fell to the ground below, suffering injuries.

Mahnke testified that after the incident he examined the 4 x 4 posts and the railing section which gave way and found that the railing ends had dry rot in them. He stated that wood with dry rot would retain its form but not its strength and that this condition would not be readily visible if the wood had been painted over.

Mrs. Blattner testified that Mahnke had warned her of the railing's rotting condition prior to painting the railing. She also testified that several times she had asked Mahnke to repair the railing because it was rotting; she stated that each time Mahnke responded by telling her that he was busy and would make the repair when he had time to do so. Mahnke testified that prior to the accident he had no knowledge of the rotting condition in the railing and that neither Mrs. Blattner nor her husband ever complained to him about the condition of the railing on the back porch. However, on June 7, 1974, Mahnke gave a statement to an investigator in which he related that several times he had warned Mrs. Blattner to be careful of the upstairs porch railing because he did not trust its strength. Mahnke also testified in a deposition taken April 29, 1976, that he had warned Mrs. Blattner to keep her children off the porch because of his concerns that they would crawl over the railing and that the railing would give way. At trial, Mahnke testified that these warnings merely reflected his distrust of railings in general.

After testimony was closed, the plaintiffs contended that Pagelsdorf's status was that of an invitee of Mahnke and that the jury should be instructed that Mahnke owed him a duty to exercise ordinary care. The plaintiffs proposed a special verdict inquiring whether Mahnke was "negligent in failing to keep the guardrail in question in a reasonably good state of repair." The trial court gave Wis. J I—Civil, Part I, 1005, defining negligence, but qualified that instruction as follows:

"A possessor of premises upon which he has permitted a licensee to come or remain, must exercise ordinary care to the end that proper and timely warning may be given to the licensee of hidden dangers within or upon such premises.

"A possessor has no duty to discover dangers of which he is himself unaware. His duty only is to give proper and timely warning of those dangers which are known to him, and then only as to those dangers which he realizes or, in the exercise of ordinary care, should realize, involve an unreasonable risk of causing bodily harm to the licensee."

Answering the special verdict's questions, the jury found that Mahnke had no knowledge of the railing's defective condition and, hence, apportioned no negligence to Mahnke. Following motions after verdict, the trial court entered judgment on the verdict, dismissing the Pagelsdorfs' complaint. The plaintiffs appeal.

The question on which the appeal turns is whether the trial court erred in failing to instruct the jury that Mahnke owed Pagelsdorf a duty to exercise ordinary care in maintaining the premises.

Prior to December 10, 1975, the duty of an occupier of land toward visitors on the premises was determined in Wisconsin law on a sliding scale according to the status of the visitor. To trespassers, land occupiers owed only the duty of refraining from willful and intentional injury. *Copeland v. Larson,* 46 Wis.2d 337,

341, 174 N.W.2d 745 (1970). A person who had permission to enter the land, but who went upon it for his own purposes rather than to further an interest of the possessor, was labeled a licensee. Toward a licensee, the occupier owed the limited duty of keeping the property safe from traps and avoiding active negligence. There was no obligation regarding dangers unknown to the possessor. *Id.* The highest duty—that of ordinary care—was owed to an invitee, one who entered the land upon business concerning the possessor and at his invitation. *Id.* at 342. In *Antoniewicz v. Reszczynski,* 70 Wis.2d 836, 854–55, 236 N.W.2d 1 (1975), we abolished, prospectively, the distinction between the different duties owed by an occupier to licensees and to invitees:

"It would appear, therefore, that there is little to commend the continued use of the categories of licensee or invitee in respect to the liability of the occupier of property. As we have noted, the factual distinctions between licensees and invitees are hazy and the law blurred. There is no reason why one who invites a guest to a party at his home should have less concern for that guest's safety than he has for the welfare of an insurance man who may come to the home to deliver a policy. Is the life or welfare of a friend who comes as a guest to be more lightly regarded than the life or welfare of a casual business acquaintance? To state the question is to answer it. There is no good reason why the business guest should be afforded greater protection than the social guest. Particularly in Wisconsin, where the economic-benefit theory has been discarded in respect to invitees, no logical basis for any dichotomy remains.

"While the common-law categories may have had some virtue under the feudal system of land tenures, when the lord of the land had complete and autocratic control of his property irrespective of harm to the community, such concept of land holding has long since vanished. We recognize numerous limitations upon the right to use real property, most of which are imposed by the police power."

The facts of the instant case arose before the *Antoniewicz* decision; the parties agree that the extent of Mahnke's duty toward Pagelsdorf turns on whether Pagelsdorf was an invitee or a licensee with respect to Mahnke. Pagelsdorf maintains he was Mahnke's invitee; if he was, the jury should have been instructed that Mahnke owed him a duty of ordinary care. The defendants contend that the trial court properly determined that Pagelsdorf was Mahnke's licensee and, therefore, properly instructed the jury that he owed Pagelsdorf only a duty to warn of known hazards.

These arguments overlook the effect on a landowner's common law duty upon transfer of the premises from the owner to a lessee. The classification of visitors identified the degree of duty of the possessor or occupier of the premises. 2 Harper and James, *The Law of Torts,* sec. 27.2, 1433 (1956). When the property is leased, the duty of the landlord was controlled by a different rule: That, with certain exceptions, a landlord is not liable for injuries to his tenants and their visitors resulting from defects in the premises. *See, e.g.: Skrzypczak v. Konieczka,* 224 Wis. 455, 458, 272 N.W. 659 (1937). The general rule of nonliability was based on the concept of a lease as a conveyance of property and the consequent transfer of possession and control of the premises to the tenant. 2 Harper and James, *supra,* sec. 27.16 at 1506; Restatement (Second) of *Torts,* sec. 356, Comment *a* (1965).

There are exceptions to this general rule of nonliability. The landlord is liable for injuries to the tenant or his visitor caused by a dangerous condition if he contracts to repair defects, or if, knowing of a defect existing at the time the tenant took possession, he conceals it from a tenant who could not reasonably be expected to discover it. *Skrzypczak v. Konieczka, supra; Kurtz v. Pauly,* 158 Wis. 534, 538–39, 149 N.W. 143

(1914); *Flood v. Pabst Brewing Co.,* 158 Wis. 626, 631–32, 149 N.W. 489 (1914). Additionally, the general rule is not applicable where the premises are leased for public use, or are retained in the landlord's control, or where the landlord negligently makes repairs. Restatement (Second) of *Torts,* secs. 359–62 (1965). The rule of nonliability persists despite a decided trend away from application of the general rule and toward expansion of its exceptions. Restatement (Second) of *Property,* (Tentative Draft No. 4), Ch. 16 (1976); Restatement (Second) of *Torts,* secs. 35–56 (1965).

None of the exceptions to the general rule are applicable to the facts of this case. The premises were not leased for public use, nor was the porch within Mahnke's control, nor did he negligently repair the railing. The plaintiffs argue that Mahnke contracted to repair defects; but according to Mrs. Blattner's testimony, Mahnke's promise extended only to items the Blattners reported as being in disrepair. Therefore, error cannot be predicated on the trial court's failure to give an instruction concerning Mahnke's constructive knowledge where the asserted contract was to repair defects of which Mahnke actually knew. Finally, the concealed-defect exception does not apply because there was no evidence that the dry rot existed in 1969 when the Blattners moved in and because Mrs. Blattner testified that she knew of the rot in the railing.

Therefore, if we were to follow the traditional rule, Pagelsdorf was not entitled to an instruction that Mahnke owed him a duty of ordinary care. We believe, however, that the better public policy lies in the abandonment of the general rule of nonliability and the adoption of a rule that a landlord is under a duty to exercise ordinary care in the maintenance of the premises.

Such a rule was adopted by the New Hampshire court in *Sargent v. Ross,* 113 N.H. 388, 308 A.2d 528

(1973). The plaintiff's four-year-old child fell to her death from an outdoor stairway of a residential building owned by the defendant. In a wrongful death action against the landlord, the plaintiff claimed the stairs were too steep and the railing inadequate. The jury awarded the plaintiff damages, and the landlord appealed from a judgment entered on the verdict. After eliminating the established exceptions to the rule of nonliability, the court concluded that the rule had nothing to recommend itself in a contemporary, urban society and ought to be abandoned. Instead, general principles of negligence should apply. The court stated that the " 'quasi-sovereignty of the landowner' " had its genesis in "agrarian England of the dark ages." *Id.* at 530. Whatever justification the rule might once have had, there no longer seemed to be any reason to except landlords from a general duty of exercising ordinary care to prevent foreseeable harm. The court reasoned that the modern trend away from special immunities in tort law and the recognition of an implied warranty of habitability in an apartment lease transaction argued in favor of abolishing the common law rule of nonliability. Accordingly, a landlord's conduct should be appraised according to negligence principles. Questions of control, hidden defects, and common use would be relevant only as bearing on the general determination of negligence, including foreseeability and unreasonableness of the risk of harm.

In *Antoniewicz, supra* at 850, n. 2, we cited *Sargent* as one of many cases whose reasoning supported the abolition of the common law distinctions between licensees and invitees. The policies supporting our decision to abandon these distinctions concerning a land occupier's duty toward his visitors compel us, in the instant case, to abrogate the landlord's general cloak of

immunity toward his tenants and their visitors.[1] Having recognized that modern social conditions no longer support special exceptions for land occupiers, it is but a short step to hold that there is no remaining basis for a general rule of nonliability for landlords. Arguably, the landlord's relinquishment of possession, and consequently control of the premises, removes this case from the sweep of the policies embodied in *Antoniewicz.* We are not so pursuaded. One of the basic principles of our tort law is that one is liable for injuries resulting from conduct foreseeably creating an unreasonable risk to others. *Osborne v. Montgomery,* 203 Wis. 223, 234 N.W. 372 (1931). Public policy limitations on the application of this principle are shrinking. *See, e.g.: Antoniewicz v. Reszczynski, supra,* (limited duty of occupier toward "licensees") ; *Goller v. White,* 20 Wis.2d 402, 122 N.W.2d 193 (1963) (parental immunity) ; *Widell v. Holy Trinity Catholic Church,* 19 Wis.2d 648, 121 N.W.2d 249 (1963) (religious immunity) ; *Holytz v. Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618 (1962) (governmental immunity) ; *Kojis v. Doctors Hospital,* 12 Wis.2d 367, 107 N.W.2d 131, 107 N.W.2d 292 (1961) (charitable immunity).

The modern-day apartment lease is regarded as a contract, not a conveyance. *Pines v. Perssion,* 14 Wis.2d 590, 111 N.W.2d 409 (1961). In *Pines* we determined that modern social conditions called for judicial recognition of a warranty of habitability implied in an apartment lease:

"Legislation and administrative rules, such as the safeplace statute, building codes, and health regulations, all

[1] *See: Brennan v. Cockrell Investments, Inc.,* 35 Cal. App.3d 796, 111 Cal. Rptr. 122 (1973), in which the Court applied the policies underlying *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal. Rptr. 97, 443 P.2d 561 (1968), a leading case abrogating the tripartite classification of visitors, to a landlord-tenant case.

impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment—that it is socially (and politically) desirable to impose these duties on a property owner—which has rendered the old common-law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by the obnoxious cliche, *caveat emptor.* Permitting landlords to rent 'tumble-down' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency, and high property taxes for conscientious landowners." *Id.* at 595–96.

It would be anomalous indeed to require a landlord to keep his premises in good repair as an implied condition of the lease, yet immunize him from liability for injuries resulting from his failure to do so. We conclude that there is no remaining justification for the landlord's general cloak of common law immunity and hereby abolish the general common law principle of nonliability of landlords toward persons injured as a result of their defective premises.

At trial plaintiffs' counsel requested the jury be instructed that Mahnke owed Pagelsdorf, as his invitee, a duty of ordinary care. Pagelsdorf's proposed special verdict inquired whether Mahnke was "negligent in failing to keep the guardrail in question in a reasonably good state of repair." Thus Pagelsdorf preserved the assigned error for appeal. We simply reach the result he seeks by a different means. *Cf.: Haumschild v. Continental Casualty Co.,* 7 Wis.2d 130, 141–42, 95 N.W.2d 814 (1959).

We have considered whether the rule we adopt today was so strongly implied in *Antoniewicz* that it might be unfair, in light of the prospective operation of that

holding, to apply it to these facts which occurred before that decision. While the instant holding is a natural outgrowth of *Antoniewicz*, we believe the rule abrogated herein is distinguishable from *Antoniewicz* because the rule governing landlord liability was predicated on lack of control over the premises. Accordingly, the application of the new standard to landlord liability is not governed by the prospective operation of *Antoniewicz*. Nor are we persuaded that the rule adopted herein should operate prospectively only. Generally, a decision overruling or repudiating other cases is given retrospective operation. *Fitzgerald v. Meissner & Hicks, Inc.*, 38 Wis.2d 571, 575, 157 N.W.2d 595 (1968). The rule of landlords' nonliability was riddled with many exceptions; thus reliance on the rule could not have been great. *See:* Love, *Landlord's Liability for Defective Premises: Caveat Lessee, Negligence, or Strict Liability?*, 1975 Wis. L. Rev. 19, 116–17. We find no reason to depart from the general rule of retrospective operation of the mandate herein.

In conclusion, a landlord owes his tenant or anyone on the premises with the tenant's consent a duty to exercise ordinary care. If a person lawfully on the premises is injured as a result of the landlord's negligence in maintaining the premises, he is entitled to recover from the landlord under general negligence principles. Issues of notice of the defect, its obviousness, control of the premises, and so forth are all relevant only insofar as they bear on the ultimate question: Did the landlord exercise ordinary care in the maintenance of the premises under all the circumstances?

*By the Court.*—Judgment reversed and cause remanded for proceedings consistent with this opinion.

COFFEY, J., took no part.