Argued and submitted May 5, the decisions of the Court of Appeals and trial court are reversed and remanded to the trial court for further proceedings September 29, 1988

BELLIKKA,
*Petitioner on Review,*

*v.*

GREEN,
*Defendant,*

*and*

COLUMBIA CHRISTIAN COLLEGE,
*Respondent on Review.*

(CC A8507-04251; CA A42728; SC S34821)

762 P2d 997

Stan Sather, Portland, argued the cause and filed the petition for petitioner on review.

Thomas M. Christ, of Mitchell, Lang & Smith, Portland, argued the cause and filed a response to the petition for respondent on review.

JONES, J.

Gillette, J., filed a separate opinion concurring in part and specially concurring in part.

**JONES, J.**

The question in this case is whether a landowner who rents real property to a tenant is liable to a third person injured by a dangerous condition on the rented property known to the landowner at the time of the rental.

Plaintiff brought a personal injury action against Carol Green, tenant, and Columbia Christian College (the College), landowner, alleging that the College had rented property with a concealed hole in the lawn into which the plaintiff fell while "trick or treating" on Halloween. The circuit court granted the College's motion to dismiss plaintiff's complaint against the College under ORCP 21A(8) as not stating ultimate facts sufficient to constitute a claim.[1] The Court of Appeals affirmed. *Bellikka v. Green,* 88 Or App 604, 746 P2d 255 (1987). We reverse the decision of the Court of Appeals.

The factual allegations of the second amended complaint on which plaintiff predicates the College's liability may be summarized as follows. The College owned a residence on N.E. 92nd Place in Portland, which it rented to Carol Green in February 1984. At 5:30 p.m. on Halloween of the same year, plaintiff accompanied her pre-school children across the lawn as the children were going to the front door of the house to trick-or-treat. The porch light was on at the residence. There was no sidewalk leading to the front door. Plaintiff fell and was injured after she stepped into a partially concealed hole in

---

[1] Plaintiff filed an amended complaint stating five claims for relief: (1) "STATUTORY WARRANTY OF HABITABILITY," (2) "IMPLIED WARRANTY OF HABITABILITY," (3) "STATUTORY TORT," (4) "COMMON LAW NEGLIGENCE," and (5) "COMMON LAW NEGLIGENCE." Each claim named defendant College; the fifth claim included defendant tenant, who is not a party to this appeal. The court dismissed the amended complaint with leave to replead without reference to the Residential Landlord and Tenant Act and implied warranty of habitability (claims (1) and (2)).

Plaintiff ignored the instruction and repled the same five claims for relief in the second amended complaint. Defendant moved to dismiss plaintiff's first and second claims only, on the basis that plaintiff had repled the previously dismissed allegations. The court thereupon dismissed the second amended complaint in its entirety with prejudice.

As a result, plaintiff's third, fourth and fifth claims were dismissed, although there was no motion to that effect before the court. Plaintiff appealed the entire dismissal to the Court of Appeals, which considered the merits of all of plaintiff's claims. The trial court's dismissal of the entire complaint brings all five claims before this court as well.

the lawn about three feet from the paved driveway. Plaintiff alleged that the hole had been in the lawn prior to the time defendant rented the house to Green, and that defendant knew or should have known of the existence of the hole and failed to fix or give warning about the hole.

Plaintiff's claims for relief are based on five interrelated theories of liability. Plaintiff's first and third claims are based on defendant's alleged violation of its duty under the Residential Landlord and Tenant Act (RLTA), ORS 91.700 to 91.895, to maintain the rental premises in a habitable condition. The second claim is based on defendant's alleged breach of an implied warranty that the rental premises are habitable. The fourth and fifth claims are based on common-law negligence.

## RESIDENTIAL LANDLORD AND TENANT ACT CLAIMS

The RLTA provides that "[a] landlord shall at all times during the tenancy maintain the dwelling unit in a habitable condition." ORS 91.770(1).[2] This court held in *Humbert v. Sellars,* 300 Or 113, 708 P2d 344 (1985), that tenant's guest may recover damages from the landlord for violation of the landlord's duty under the Act. Plaintiff relies on an extension of *Humbert* for her theories of liability under the RLTA. We start with a brief discussion of that case.

In *Humbert* the plaintiff was a guest who, on leaving the tenant's apartment, slipped and fell while attempting to wade through several inches of water standing on the tenant's patio. The questions before this court were whether a plaintiff other than a tenant could state a cause of action arising under the RLTA, and whether the plaintiff in *Humbert* could rely on a violation of the statute for the basis of her cause of action.

We held that persons other than tenants were protected by the RLTA. The external contiguous patio floor within the tenant's exclusive control was more like the other floors within the dwelling unit than it was like grounds. The statutory duty to maintain in "good repair" covers "floors" and not "grounds." Because evidence had been offered that the landlord had failed to keep the patio in good repair, we

---

[2] See appendix 1.

concluded that granting summary judgment for defendant landlord was improper.

In the present case, plaintiff bases her statutory warranty claim on the RLTA, claiming that it applies to the grounds of the premises in addition to the floors. Specifically, plaintiff contends that defendant violated the RLTA by renting the premises with the hole in the lawn. She relies on ORS 91.770(1)(f), which provides:

> "A landlord shall at all times during the tenancy maintain the dwelling unit in a habitable condition. For purposes of this section, a dwelling unit shall be considered unhabitable if it substantially lacks:
>
> "* * * * *
>
> "(f) Building, grounds and appurtenances at the time of the commencement of the rental agreement in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin, and all areas under control of the landlord kept in every part clean, sanitary and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin * * *."

Plaintiff seeks to erase the distinction between floors and grounds that this court made in *Humbert*. The statute sets different standards for different parts of the property. With regard to "floors" — at issue in *Humbert* — the landlord must maintain them in "good repair." As to "grounds," they must be "clean, sanitary and free from accumulation of debris." The sanitary requirements of ORS 91.770(1)(f) do not create a warranty of habitability to include a hole in the grounds present when the premises were leased. Plaintiff's claim which relies on this statute was properly dismissed.

In her third cause of action, plaintiff argues that the RLTA gives rise to a statutory tort claim against the landlord. *Brewer v. Erwin,* 287 Or 435, 600 P2d 398 (1979), held that the statement in ORS 91.725(1) of the RLTA "shall be so administered that an aggrieved party may recover appropriate damages" allowed a plaintiff to bring an action against a landlord for personal injuries. *Humbert* held that a visitor is within the class of persons that the legislature intended the RLTA to protect, and that the harm suffered by the plaintiff was of the type intended to be protected against. In other words, ORS 91.725 creates statutory liability. *See Gattman v. Favro,* 306 Or

11, 24, 757 P2d 402 (1988); *see also Nearing v. Weaver,* 295 Or 702, 670 P2d 137 (1983). Statutory liability is not necessarily "tort" liability, a characterization that might affect issues such as the measure of damages or the statute of limitations, *see* ORS 12.080(2), 12.110, 12.115. We use the phrase here because plaintiff's third claim used it.

The RLTA, after stating in ORS 91.770(1) the landlord's general obligation "at all times during the tenancy [is to] maintain the dwelling unit in a habitable condition," continues, "[f]or purposes of this section, a dwelling unit shall be considered unhabitable if it substantially lacks" a series of specified features. These include structural features such as weather protection and "[f]loors, walls, ceilings, stairways and railing maintained in good repair," ORS 91.770(1)(h); sanitary requirements, such as water and sewage connections and garbage receptacles; and locks and other features for safety from intruders and fire hazards. The statute says that substantial lack or inadequate maintenance of these features "shall be considered" to make a dwelling unhabitable, but it does not expressly say that only substantial lack or failure to maintain the listed items shall be so considered. It does not say that "unhabitable" *means* the lack of the listed features or otherwise indicate that the list is exclusive.

Statements of a general principle or category, followed by a list of particular instances, often reflects diverging goals of legislative drafting. The general statement alone may be too open-ended, communicating too little to those who must comply with it and leaving too much to argument and *post hoc* decision, unless some agency is assigned the task of refining the generality by rules. *See, e.g., Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980) (standard of "unprofessional conduct"). Those who bear the burden of compliance not only want prior notice of their obligations, they also want those obligations confined within acceptable bounds. The drafters therefore state many requirements with some particularity. On the other hand, it is often unsatisfactory to list every particular form of the general objective to be achieved. If the demand for specificity is paramount, the list can be enacted without any reference to an overall principle or, if a collective term is needed, by phrasing it in the form of a definition.

This might have been done in the RLTA. ORS 91.770(1) could have listed items (a) through (k) without first stating a general requirement to maintain habitable conditions, or as a definition of "habitable condition." This approach, however, requires drafters to imagine and to list too many variations of the common theme, including future technological changes. For instance, if ORS 91.770(1)(e) had been written in the gaslight era, it would not have required a landlord who installed electric lights to maintain those lights.

■       This court already has recognized that other conditions besides those listed in paragraphs (a) through (k) can make residential quarters unhabitable. *Humbert v. Sellars, supra.* But when the legislature chooses to state both a general standard and a list of specifics, the specifics do more than place their particular subjects beyond the dispute; they also refer the scope of the general standard to matters of the same kind, often phrased in Latin as *"ejusdem generis."* We think that in order to fall short of what the legislature meant by "habitable condition," other shortcomings of residential premises must pose danger to health or safety of the same kind and as serious as those which the specific requirements of paragraphs (a) through (k) are meant to prevent. The legislature chose to limit safety requirements to the constructed or occupied area of the residence. Sanitary requirements have a broader sweep, but are less inclusive of all perils. The list of specific examples after the general statement both guides and limits this court. Within each category the general principles indicate what additional matters should be included, but the creation of different standards for different categories means that the standards of one category cannot be applied to others.

■■      A "statutory tort" allows recovery of damages if the plaintiff can show that the damages suffered came about as a result of the violation of a statute which the legislature passed intending to give recourse to a group of plaintiffs, which includes the plaintiff then seeking redress under the terms of the statute. *Brewer v. Erwin* establishes that the RLTA gives rise to a statutory tort, and *Humbert v. Sellars* shows that the present plaintiff is within the group of persons protected by the statute. However, as mentioned, plaintiff has failed to show that there was any violation of the statute in this case. For that reason plaintiff cannot benefit from the statutory

tort recognized in *Humbert,* and plaintiff's third cause of action was properly dismissed.

## IMPLIED WARRANTY OF HABITABILITY CLAIM

Plaintiff contends that "[b]ecause of the contractual agreement for the rental premises between Defendant Tenant Green and Defendant Landlord College there was at all times an implied warranty of habitability given by Defendant Landlord College for the protection of the tenant and others lawfully on the property with the implied permission of the tenant," which was violated by defendant. Plaintiff alleges no contractual obligations between landlord and tenant beyond those created by the RLTA.

This court has not recognized an implied warranty of habitability, and we decline to do so in this case. The legislature has defined habitability in ORS 91.770 in a manner which excludes plaintiff's claims.

Plaintiff urges this court to follow the lead of other state courts which have in some cases recognized an implied warranty of habitability.[3] However, many of these opinions represent a judicial attempt to deal with disputes between landlords and tenants in the absence of any legislation. The authors of the Uniform Residential Landlord and Tenant Act, on which Oregon's act is based, drew the original statutory statement of habitability from many of these same cases. *See* 7B Uniform Laws Annotated § 2.104, Comment at 461; *Brewer v. Erwin, supra,* 287 Or at 438. The legislature has on several occasions since the original adoption of ORS 91.770 of

---

[3] Plaintiff cites four cases to support an implied warranty of habitability. While these cases do not represent the entire spectrum of cases finding an implied warranty, we note that a brief reading of the reported opinions suggests that the plaintiffs in those cases all would have had a cause of action under ORS 91.770. *See Sargent v. Ross,* 113 NH 388, 308 A2d 528 (1973) (implied warranty of habitability covers an unrepaired and dangerously steep stairway which caused the death of tenant's child guest who fell through the railing. It would appear that the landlord could have been liable under ORS 91.770(1)(h)); *Pagelsdorf v. Safeco Ins. Co. of America,* 91 Wis 2d 734, 284 NW2d 55 (1979) (a nearly identical case concerning a tenant's visitor who fell through a rotten balcony railing); *Young v. Garwacki,* 308 Mass 162, 402 NE2d 1045 (1980) (semble); *Pressony v. Mountain States Properties, Inc.,* 18 Ariz App 176, 501 P2d 17 (1972) (tenant's child burned by defective water heater, which might be within the coverage of some or all of ORS 91.770(1)(e), (i) and (j)).

the RLTA amended the statute to expand the statutory definition of habitability.[4] This careful legislative attention, meeting much of the original need for judicially created implied warranties of habitability, leaves no room to invent a theory of landlord obligations beyond those created in the statute or already existing at common law. We refuse plaintiff's invitation to do so.

## COMMON-LAW NEGLIGENCE CLAIMS

■ Plaintiff's theory justifying defendant's liability under the common law has varied over time.[5] However, plaintiff has argued consistently that she can state a claim against defendant separate from the provisions of the RLTA. The RLTA does not supersede the common law in all aspects of personal injury liability. *See Jones v. Bierek,* 306 Or 42, 755 P2d 698 (1988).

Before the Court of Appeals, plaintiff limited her argument to a claim that the facts of her case fell within one of the exceptions to section 356 of the Restatement (Second) of Torts (1965).[6] The Court of Appeals held that it did not.

---

[4] The most significant changes from the original draft of the Uniform Residential Landlord and Tenant Act came with the adoption of ORS 91.770 in 1973. Or Laws 1973, ch 559, § 14. The legislature wrote the present subsection (1) to state clearly that the landlord was obliged to maintain the habitability of the dwelling unit. Paragraph (f) was specifically added in its present language, as was paragraph (h). The draft of the Uniform Residential Landlord and Tenant Act only provides that a landlord shall:

"(2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition.

"(3) keep all common areas of the premises in a clean and safe condition."

Since the original enactment of ORS 91.770, the legislature has added requirements that the landlord provide locks for all outside doors, Or Laws 1979, ch 643, § 2; latches for all windows that might be an entryway, Or Laws 1981, ch 753, § 1; and garbage removal service in large cities, Or Laws 1987, ch 611, § 11.

[5] Plaintiff's second amended complaint referred to these claims as being "common law" negligence. In her brief before the Court of Appeals, plaintiff characterized these claims by reference to the Restatement (Second) of Torts. In her petition to this court, plaintiff rejects the Restatement and relies on an analysis derived from *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 734 P2d 1326 (1987). This change apparently is in response to note 3 in the Court of Appeals opinion which mentioned plaintiff's omission of any analysis under "the Supreme Court's recent 'duty trilogy': *Donaca v. Curry Co.,* 303 Or 30, 734 P2d 1339 (1987); *Kimbler v. Stillwell,* 303 Or 23, 734 P2d 1341 (1987); *Fazzolari v. Portland School District No. 1J, [supra]*." 88 Or App at 608 n 3.

[6] The Restatement (Second) of Torts, section 356 provides:

"Except as stated in [sections] 357-362 a lessor of land is not liable to his

Plaintiff now argues that our recent decisions in *Fazzolari v. Portland School Dist. No. 1J,* 303 Or 1, 734 P2d 1326 (1987); *Kimbler v. Stillwell,* 303 Or 23, 734 P2d 1344 (1987); and *Donaca v. Curry Co.,* 303 Or 30, 734 P2d 1339 (1987), require that this court abandon the common-law notion of landlord liability recognized in the Restatement.

The cases now referred to as the *Fazzolari* trilogy[7] were an attempt to clarify one aspect of common-law tort liability; they should not be treated as if they were a restructuring of all negligence law. They dealt with one major problem: the common reliance on the defense of "no duty" to short-circuit the proper examination of the facts in a particular case. We hope the opinions made it clear that, in the absence of specific legal duties, questions of foreseeable risk and reasonable action in light of the risk ordinarily depend on examining a defendant's actions in the particular circumstances.

The question in the present case is not whether *Fazzolari* requires that this court abandon the principles set forth in the Restatement (Second) of Torts § 356. That case does not make principles of common-law negligence apply where they otherwise would not. The question is whether the principles of modern negligence law are in conflict with the

---

lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession."

Plaintiff argued that her case fell within the exceptions contained in either section 360:

"A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."

or section 362:

"A lessor of land who, by purporting to make repairs on the land while it is in the possession of his lessee, or by the negligent manner in which he makes such repairs has, as the lessee neither knows nor should know, made the land more dangerous for use or given it a deceptive appearance of safety, is subject to liability for physical harm caused by the condition to the lessee or to others upon the land with the consent of the lessee or sublessee."

[7] *See, e.g.,* Casenote, *The Proper Judicial Role in Negligence Actions: The Fazzolari Trilogy Redefines "Negligence,"* 24 Willamette L Rev 443 (1988).

traditional rules of landowner liability set forth in the Restatement and, if so, which rules are more properly applied to the present situation? To answer this question we must examine the development of the ideas set forth in the Restatement, and their relevance to the contemporary world.[8]

### Landowners and visitors.

Before beginning this examination of the development of the law in this area, it is important to recognize that the present case concerns only a limited part of the common law of landowner liability. The issue before this court concerns a landowner's potential liability to a visitor under the common law. We are not concerned with the question of liability of a landlord to the tenant. Despite the important distinctions that might exist between a landlord's liability to visitors and liability to tenants, the traditional response of the common law has been to consider a landowner's liability to both parties as being the same. Thus, the Restatement (Second) of Torts, section 356, speaks of a landlord's liability to "his lessee or to others on the land" as being the same.

The tendency of the traditional common law to view a landowner's potential liability to tenants and visitors as being nearly indistinguishable from landlord-tenant liability represents one of the shortcomings of this traditional view. It also means that much of any discussion of the development of the common law in this area will not be able to make distinctions between landlord-tenant and landowner-visitor situations. Despite considering the two types of liability as similar for purposes of some portions of the discussion, we note now that this opinion is limited to a discussion of the proper basis of potential liability for landowners with respect to visitors who are on the property at the invitation of the tenant.

### The history of the Restatement view.

The Restatement provision expressed in section 356 that a lessor of land is not liable to "others on the land" for physical harm caused by any dangerous condition which

---

[8] When called upon to re-examine a nonstatutory rule or doctrine previously adopted by this court, we have adhered to the principle stated by Mr. Justice Holmes in *New York Trust Co. v. Eisner,* 256 US 345, 349, 41 S Ct 506, 65 L Ed 963 (1921): "Upon this point a page of history is worth a volume of logic." *See Heino v. Harper,* 306 Or 347, 759 P2d 253 (1988).

existed when the lessee took possession is based on a conveyance concept of property which this court, in *Jensen v. Meyers,* 250 Or 360, 363, 441 P2d 604 (1968), found is not by itself a satisfactory explanation for immunizing the lessor from liability. We now trace the history of this Restatement view.

The nature of a real property lease has gone through several changes. This development has been well traced in many law review articles in the last quarter century.[9] After the Norman Conquest, land was held by persons as "tenants" of William the Conqueror, who held title to all land in England.[10] As the tenancy for years began to develop, mainly as a means to circumvent the church's prohibition against usury,[11] the law regarded this kind of tenant's interest as contractual, and the tenant could not enforce his rights in real actions in the king's courts. As husbandry leases arose, tenants of agrarian lands gained the court's recognition that they had interests in land that could be enforced by real actions. In 1499, the tenant's right to maintain ejectment, a possessory action against strangers, was recognized. "The development of the action of ejectment marked the end of the era in which the lease was considered primarily as a contract." Love, *Landlord's Liability for Defective Premises:* Caveat Lessee, *Negligence, or Strict Liability?,* 1975 Wis L Rev 19, 25-26 (hereinafter cited as Love).

In the sixteenth century, leases were almost exclusively of land without physical structures. The tenant leased the land to till it. He paid the rents from the fruits of his labor on the land. Because the tenant primarily was interested in the land itself, the condition of any buildings was not considered by the courts to be important. The lease came to be

---

[9] *See, e.g.,* Browder, *The Taming of a Duty—The Tort Liability of Landlords,* 81 Mich L Rev 99 (1982) (hereinafter Browder); Love, *Landlord's Liability for Defective Premises:* Caveat Lessee, *Negligence, or Strict Liability?,* 1975 Wis L Rev 19 (hereinafter Love); Quinn & Phillips, *The Law of Landlord-Tenant: A Critical Evaluation of the Past with Guidelines for the Future,* 38 Fordham L Rev 225 (1969).

[10] William the Conqueror "leased" the land to his chief followers, who in turn "subinfeudated" the land to others. The nature of the tenancies was thus created as described in Love, *supra* note 9, at 23-24.

[11] "A landowner in need of funds would make a lease for a term of years to a tenant in return for a lump sum consideration, payable in advance. The tenant would then recoup his rent, plus a healthy profit, from the use of the land during the term." Love, *supra* note 9, at 24.

regarded as a conveyance of an interest in realty. Love, *supra,* at 26. While perhaps logical for the times in which it was developed, this notion has held on long past the time when its logic had any connection to the reality of most landlord-tenant relationships.

With the onset of the Industrial Revolution, persons desiring to rent residential and commercial properties began to be interested in the use of structural improvements on the land rather than the land itself. The lease instrument began to resemble a contract more than a conveyance.[12]

Legal scholars recognized the change in the character of a lease and began to question whether a lease was a conveyance or a contract. According to Professor Love, their answer was that it was both. Love, *supra,* at 27. Most courts, however, continued to be concerned with the scarce commodity of land and to regard the lease as primarily a conveyance of realty. The result was that the landlord-tenant relationship continued to be governed by analogies to real property law.[13]

Real property law of the time decreed that a purchaser of real property took the property "as is" and, therefore, so did a lessee. This doctrine of "caveat emptor" or "caveat lessee" is described in the words of Coke:

---

[12] "The parties would frequently include express covenants that, for example, placed limitations on the use of the land and the tenant's right to transfer, governed the time and manner of paying rent, regulated the erection and removal of improvements, fixed or apportioned liability for insurance and taxes, provided for security deposits and options to purchase or renew, and allocated responsibility for repairing defects in the premises." Love, *supra* note 10, at 26-27 (footnote omitted).

[13] Early in the development of the Industrial Revolution, there may have been a few courts which recognized the changed nature of leases.

"When the issue was first presented, counsel for the lessors were hard put to find authority for their position [of caveat lessee]. There was a tendency to repudiate the concept. It may be that the stirrings of early Victorian conscience rebelled at applying the doctrine to human habitation." Grimes, *Caveat Lessee,* 2 Valparaiso L Rev 189, 195 (1968).

Professor Grimes reports four English decisions relieving tenants of their obligations when the rented premises became unhabitable, ranging from 1829 to 1843. It is clear, however, that later decisions repudiated what Professor Grimes reports came to be regarded as a "vile heresy."

Thus, it is not certain that English law applied "caveat lessee" to residential leases in 1843, when Oregon adopted the common law of England, *see* Act of July 5, 1843, *reprinted* in Harris, *History of the Oregon Code,* 1 Or L Rev 129, 135 (1922); Act of June 27, 1844, Or Laws 1843-49 at 98, 100 art II, § 1 (1982).

"Note that by the civil law every man is bound to warrant the thing that he selleth or conveyeth, albeit there be no express warranty * * * either in deed or in law; but the common law bindeth him not, for *caveat emptor*." Love, *supra*, at 27-28 (quoting 2 Coke, A commentary on Littleton 102(a), c 7, § 145 (1853 ed)).

Just as did the grantee of land, the lessee took the premises with whatever defects were present at the time of leasing, and the lessor had no responsibility to anyone to maintain the premises or repair them, and for want of this duty the lessor had an immunity against liability to anyone on the land who was injured by a defective condition of the premises. Love, *supra*, at 48. The common law came to accept and enforce this harsh rule, despite occasionally recognizing that it was at odds with other principles of the law. "[F]raud apart, there is no law against letting a tumbledown house." *Robbins v. Jones*, 143 Eng Rep 768, 776 (1863) (Opinion of Chief Justice Erle).

It is this rule of immunity that is restated in section 356 of the Restatement:

"When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the land for the term of the lease. The lessee acquires an estate in the land, and becomes for the time being the owner and occupier, subject to all of the liabilities of one in possession, both to those who enter the land and to those outside of it. Therefore, as in the case of the vendor under § 352, it is the general rule that the lessor is not liable to the lessee, or to others on the land, for injuries occurring after the lessee has taken possession, even though such injuries result from a dangerous condition existing at the time of the transfer." Comment *a* to section 356.

The exceptions to section 356 found in sections 357-62 are generally regarded as expressions of a need to temper this rule because of the realities surrounding the shift from agrarian to the more modern nature of tenancies, both commercial and residential. Courts had long recognized the conflict between the law and reality but were reluctant to depart from the traditional interpretation of tenancies. In 1918, the Supreme Court of the United States, applying Massachusetts law, noted the illogic of the idea that a lease was a conveyance rather than a contract:

"But the law as to leases is not a matter of logic *in vacuo;* it is a matter of history that has not forgotten Lord Coke." *Gardiner*

*v. Butler & Co.,* 245 US 603, 605, 38 S Ct 214, 62 L Ed 505 (1918).

*Rifts in the Restatement's edifice.*

Voices began to be heard suggesting that it was time to apply logic to the reality of landlord-tenant and landowner-guest relationships. In *Bowles v. Mahoney,* 202 F2d 320, 323 (DC Cir 1952), the majority held that absent any statutory or contract duty, the lessor was not responsible for an injury to the tenant's invitee resulting from a defect which developed during the lease term. In his dissent, Judge Bazelon stated that the majority's holding was "an anachronism which has lived on through stare decisis alone rather than through pragmatic adjustment to 'the felt necessities of [our] time.' " *Id.* at 325. Accordingly, Judge Bazelon said that he would discard the majority's rule and "cast the presumptive burden of liability upon the landlord." *Id.* In arguing that the court should have changed the common-law rule rather than followed it, Judge Bazelon stated:

> "There is no fixed line dividing the sphere of action as between the legislature and the courts for effecting needed change of a common law rule. The line should not be marked with 'metaphysical conceptions of the nature of judge-made law, nor by the fetish of some implacable tenet, such as that of the division of governmental powers, but by considerations of convenience, of utility, and the deepest sentiments of justice.' 'Change of this character should not be left to the Legislature.' 'If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.' " *Id.* at 328 (footnotes omitted).

Finally, in the early 1970s, some courts, having recognized the antecedents of the common-law rule stated in section 356 and finding that its *raison d'etre* was no longer valid, abolished the landlord immunity to third persons injured by reason of a dangerous condition of the premises. The leading case seems to be *Sargent v. Ross,* 113 NH 388, 308 A2d 528 (1973). There, a child who was a guest of a tenant fell to her death on steep stairs in a residential building. The child's mother brought an action for damages. The mother contended that the landowner was negligent on two alternative theories. They appear to be those recognized as exceptions to the rule of section 356, namely, section 360 (parts of land retained in

lessor's control) and section 362 (negligent repairs by lessor). The court believed that it could strain or broaden the limits of either exception to impose liability, but forthrightly chose to vitiate the rule of immunity:

> "[W]e today discard the rule of 'caveat lessee' and the doctrine of landlord nonliability in tort to which it gave birth. We thus bring up to date the other half [in addition to warranty of habitability] of landlord-tenant law. Henceforth, landlords as other persons must exercise reasonable care not to subject others to an unreasonable risk of harm. [Citations.] A landlord must act as a reasonable person under all of the circumstances including the likelihood of injury to others, the probable seriousness of such injuries, and the burden of reducing or avoiding the risk. [Citations.] We think this basic principle of responsibility for landlords as for others 'best expresses the principles of justice and reasonableness upon which our law of torts is founded.' [Citation.] The questions of control, hidden defects and common or public use, which formerly had to be established as a landlord, will now be relevant only inasmuch as they bear on the basic tort issues such as the foreseeability and unreasonableness of the particular risk of harm." 308 A2d at 534.

In *Pagelsdorf v. Safeco Ins. Co. of America,* 91 Wis 2d 726, 284 NW2d 55 (1979), a residential tenant's invitee or guest was injured when he leaned against a porch railing which broke, allowing him to fall some distance to a lower level. A jury found that the landlord had no prior knowledge of the rotten condition of the rail, and judgment was entered for the defendant landlord. The Supreme Court recognized section 356 as stating the general rule of immunity but noted a trend:

> "The rule of nonliability persists despite a decided trend away from application of the general rule and toward expansion of its exceptions. Restatement (Second) of *Property,* (Tentative Draft No. 4), Ch. 16 (1976); Restatement (Second) of *Torts,* secs. 355-56 (1965)." 284 NW2d at 59.

The court then noted that none of the exceptions to the general rule fit the case and, if the court were to follow the general rule, plaintiff would lose. The court abandoned the general rule:

> "We believe, however, that the better public policy lies in the

abandonment of the general rule of nonliability and the adoption of a rule that a landlord is under a duty to exercise ordinary care in the maintenance of the premises.

"* * * Questions of control, hidden defects, and common use would be relevant only as bearing on the general determination of negligence, including foreseeability and unreasonableness of the risk of harm." 284 NW2d at 59.

The court specifically elected to follow the lead of *Sargent v. Ross, supra.*

*Young v. Garwacki,* 380 Mass 162, 402 NE2d 1045 (1980), was factually similar to *Pagelsdorf.* There the injured plaintiff, a guest of the tenant, appealed from a judgment notwithstanding the verdict for the defendant landlord. The Supreme Court of Massachusetts, on its own motion, brought the case up from the intermediate court. Noting the history of the law that led to the rule of immunity, the court stated:

"Today, we do away with the ancient law that bars a tenant's guest from recovering compensation from a landlord for injuries caused by negligent maintenance of areas rented to the tenant. Like the other rules based on status, this rule has prevented a whole class of people from raising the overriding issue: whether the landlord acted reasonably under the circumstances. The practical result of this archaic rule has been to discourage repairs of rented premises. In cases like the one before us, a landlord with knowledge of a defect has less incentive to repair it. And the tenant, who often has a short-term lease, limited funds, and limited experience dealing with such defects, will not be inclined to pay for expensive work on a place he will soon be leaving. Thus, the defect may go unrepaired until an unsuspecting plaintiff finds herself with a lawsuit that care could have prevented." 402 NE2d at 1049 (footnote omitted).

The court specifically noted *Sargent v. Ross, supra,* and the "basic principle" of responsibility discussed therein.

Twenty years ago this court acknowledged that the Restatement's reliance on leased property as conveyed property was unsatisfactory. The court quoted, with apparent approval, from 2 Harper & James, Torts 1509, § 27.16 (1956): "[I]t is no part of the general law of negligence to exonerate a defendant simply because the condition attributable to his negligence has passed beyond his control before it causes injury (if the injury was foreseeable at the time defendant still

had control)." *Jensen v. Meyers, supra,* 250 Or at 363. Justice O'Connell, writing for the court, wrote:

> "[T]he immunity of the lessor may be rested upon grounds other than the mere transfer of a property interest to the lessee. * * * The exceptions engrafted upon the lessor's immunity from liability appear to be based principally upon the ground that the hazard created by the lessor is not likely to be remedied or immunized by the lessee and thus the lessor is made liable upon the well accepted principle that one is liable for reasonably foreseeable harms. * * *" *Id.* at 363.

The court noted the unlikelihood of a lessee remedying a hazardous condition, "particularly * * * under a short term lease * * * or where lessor agrees to repair * * * or where there is an undisclosed dangerous condition known to the lessor, or where lessor retains control of a part of the leasehold." *Id.* at 363-64 n 4.[14] The court then articulated the following test (which apparently was adopted from *Webel v. Yale University,* 125 Conn 515, 524, 7 A2d 215, 123 ALR 863 (1939)): "[T]he nature of the defect might be such that the landlord would reasonably expect that the tenant would take steps to remedy the defect or otherwise to safeguard persons entering them at his invitation." *Jensen v. Meyers, supra,* 250 Or at 364 & n 5.

We believe that this is a sound premise for determining liability to "others on the property" of leased premises. We do not reach the question in this case of the scope of "other persons," be they children of the tenant or members of the public where the premises are leased for purposes involving the admission of the public. The "other persons" in this case were not trespassers, not persons in the status of a tenant and not persons on the premises of property leased for the use of the general public. The question remains whether as a matter of law the landlord would reasonably expeect hat the tenant would remedy the defect in the yard, as the court answered the liability issue in *Jensen v. Meyers,* or whether that issue should be left to the trier of fact.

---

[14] We agree with what is implicit in these comments, that the length of the rental or lease is not determinative, but the time the tenant or lessee is in occupancy. The time and opportunity to repair defects are more important than the length provided in the tenancy or lease agreement.

## APPLYING COMMON-LAW NEGLIGENCE
## TO THE PRESENT CASE

In her pleadings, plaintiff alleged (1) that the hole in the lawn was present when the lease was signed, (2) that the landlord knew or should have known that the hole presented an unreasonable risk of harm to foreseeable persons such as plaintiff, and (3) that plaintiff was injured as a direct result of defendant's "negligence" in failing to fill the hole or otherwise protect against the risk to plaintiff.

Plaintiff, if legitimately on the premises, has a potential cause of action for common-law negligence, which is based on a landlord's duty to repair the alleged dangerous condition on the premises. We must now determine if plaintiff has alleged sufficient facts to state such a claim. It is at this point, rather than the earlier point argued by plaintiff, that this court's decisions in *Fazzolari v. Portland School Dist. No. 1J*, *supra*; *Kimbler v. Stillwell, supra*; *Donaca v. Curry Co., supra*, and related cases become important.

As already mentioned, the purpose of these cases was to clarify one particular aspect of common-law negligence. These cases did not abrogate the court's role in preliminary matters:

> "The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged or the evidence presented no reasonable factfinder could decide one or more elements of liability for one or the other party." *Fazzolari*, 303 Or at 17.

The elements of liability that existed before and continue to be important after *Fazzolari* include, but are not limited to, such questions as whether the defendant unreasonably created a risk of harm to the protected interests of a reasonably foreseeable group or class of people which would include the plaintiff, whether the defendant knew or should have recognized that risk, and whether the defendant acted reasonably in light of the risk created. Thus, in ordinary tort actions, the plaintiff must make sufficient allegations to show at least that the defendant acted unreasonably during or after the creation of an actual and foreseeable risk to a foreseeable plaintiff of the same type as the present plaintiff.

■ Plaintiff's allegation that defendant was "negligent" in not filling the hole can be treated as a statement that defendant acted unreasonably in light of a foreseeable risk. Plaintiff stated sufficient facts to withstand a motion to dismiss for failure to state facts sufficient to constitute a claim. Subsequent discovery should clarify the actual facts needed to support plaintiff's claim. At any time it is proper, defendant may again challenge the connection between the facts and the legal theory on which plaintiff must rely. *See Uihlein v. Albertson's, Inc.,* 282 Or 631, 580 P2d 1014 (1978).

Two specific characteristics of the landlord-tenant relationship must be recognized in this and similar cases: the influence of the landlord's limited control over the premises, and the influence of the RLTA.

■ The landlord's degree of control has already been mentioned. The theory of limiting landlord's liability expressed in the Restatement (Second) of Torts was based in part on this aspect of the landlord-tenant relationship. While a landlord cannot rely exclusively on the principles of the Restatement to escape liability, the degree of the landlord's control is an element, of which landlords and the courts should not lose sight.[15] The present statute, ORS 91.785(1), prohibits a tenant from unreasonably restricting a landlord from making reasonable repairs. It provides:

"A tenant shall not unreasonably withhold consent to the landlord to enter into the dwelling unit in order to inspect the

---

[15] For example, in *Jensen v. Meyers,* 250 Or 360, 364-65, 441 P2d 604 (1968), this court specifically noted that, under some circumstances, it is reasonable for a landlord to assume that a tenant will discover and make safe any obvious hazards on the property:

"The present case does not fall within any of the recognized exceptions [from the Restatement] to lessor's non-liability. * * *

"The mere fact that the hazard could have been eliminated by [the landlord] does not make him liable for plaintiff's injuries. * * * We are of the opinion that the lessor should not be liable under these circumstances on the ground that he should be entitled to expect that the lessee will take the necessary steps to eliminate the hazard or to warn his guests of the danger."

Under most circumstances what is reasonable behavior in a particular set of circumstances, like other uncertain general standards being applied in a particular case, will be a question to be determined by the finder of fact. The application of ordinary negligence standards to the landlord-tenant relationship does not prevent a landlord, or a tenant or a visitor, from pleading or arguing the facts of the special relationship created by a residential lease.

premises, make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers or contractors."

Of course, this issue of control, like many others concerning the landlord-tenant relationship, is affected by the existence of the RLTA. The landlord's right of access to the property is set forth in the RLTA, *see* ORS 91.785(3).[16] In these and other ways, the RLTA will have an influence on actions between landlords and third persons injured on the rented or leased premises.

■ Statutory law may be important in several ways. This court has recognized that there are instances where the legislature has, in effect, created a tort. *See, e.g., Chartrand v. Coos Bay Tavern,* 298 Or 689, 696 P2d 513 (1985). Such statutory torts exist independent of any parallel common-law claim and can be pleaded independently, with or without an accompanying common-law claim. *Holien v. Sears, Roebuck and Co.,* 298 Or 76, 689 P2d 1292 (1984); *Nearing v. Weaver, supra,* 295 Or at 707.

■ Even where a statutory tort is not available, a plaintiff, or a defendant, may be able to use a statute to meet or support one of the elements of his or her claim or defense in an ordinary negligence action. Where a statute establishes all the elements of common-law negligence, the violation of the statute can be pled as a fact to establish negligence per se. This is true whether or not the statute provides for recovery of damages. *See, e.g., Chartrand v. Coos Bay Tavern, supra,* 298 Or at 695 (pleading common-law negligence and negligence per se for violation of a statute is also sufficient to state a claim under a statutory tort theory); *Barnum v. Williams,* 264 Or 71, 504 P2d 122 (1972) (violation of a motor vehicle statute is negligence per se unless reasonable care would be a defense under the circumstances).

■ A statute can be used to establish the proper standard of care, and to show that the defendant met or failed to meet this standard. *Cain v. Rijken,* 300 Or 706, 717 P2d 140 (1986); *Brown v. Transcon Lines,* 284 Or 597, 588 P2d 1087 (1978). Even if the statutory standard of care cannot be shown to

---

[16] See appendix 2.

apply to the defendant, the statute might indicate standards of care that the defendant should have met. *Shahtout v. Emco Garbage Co.,* 298 Or 598, 601, 695 P2d 897 (1985); *Brown v. Transcon Lines, supra.* A statute might also be used to show that a defendant should have considered the risk to a particular group of people which includes the plaintiff in the case then before the court.

*Humbert v. Sellars, supra,* shows that a landlord must consider a tenant's visitors among the class of potential plaintiffs endangered by any risk created by the landlord. In the present case the plaintiff can therefore, but need not, use the RLTA to support or supply one of the necessary elements of her claim. However, in doing that, any plaintiff who relies on a statutory tort must take the bitter with the sweet. The plaintiff who relies exclusively on a statutory tort is limited by the statute, including any limits on damages. *See Brewer v. Erwin, supra,* 287 Or at 443.

These and other issues will be before the trial court on remand. We reverse the decision of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

# APPENDIX

1.

ORS 91.770(1) provides:

"A landlord shall at all times during the tenancy maintain the dwelling unit in a habitable condition. For purposes of this section, a dwelling unit shall be considered unhabitable if it substantially lacks:

"(a) Effective waterproofing and weather protection of roof and exterior walls, including windows and doors;

"(b) Plumbing facilities which conform to applicable law in effect at the time of installation, and maintained in good working order;

"(c) A water supply approved under applicable law, which is:

"(A) Under the control of the tenant or landlord and is capable of producing hot and cold running water;

"(B) Furnished to appropriate fixtures; and

"(C) Connected to a sewage disposal system approved under applicable law and maintained in good working order to the extent that the system can be controlled by the landlord;

"(d) Adequate heating facilities which conform to applicable law at the time of installation and maintained in good working order;

"(e) Electrical lighting with wiring and electrical equipment which conform to applicable law at the time of installation and maintained in good working order;

"(f) Building, grounds and appurtenances at the time of the commencement of the rental agreement in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin, and all areas under control of the landlord kept in every part clean, sanitary and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin;

"(g)(A) An adequate number of appropriate receptacles for garbage and rubbish in clean condition and good repair at the time of the commencement of the lease or rental agreement, and the landlord shall provide and maintain appropriate serviceable receptacles thereafter and arrange for their removal unless the parties by written agreement provide and maintain appropriate serviceable receptacles thereafter and arrange for their removal unless the parties by written agreement provide otherwise; and

"(B)   In addition to the provisions of subparagraph (A) of this paragraph, in a city with a population of over 250,000 people, garbage removal service at least two times a month for containers that allow for 30 gallons accumulation a week;

"(h)   Floors, walls, ceilings, stairways and railings maintained in good repair;

"(i)   Ventilating, air conditioning and other facilities and appliances, including elevators, maintained in good repair if supplied or required to be supplied by the landlord;

"(j)   Safety from the hazards of fire; or

"(k)   Working locks for all dwelling entrance doors, and, unless contrary to applicable law, latches for all windows, by which access may be had to that portion of the premises which the tenant is entitled under the rental agreement to occupy to the exclusion of others and keys for such locks which require keys."

2.

ORS 91.785(3) provides:

"(a)   A landlord shall not abuse the right of access or use it to harass the tenant. Except in case of emergency, agreement to the contrary or unless it is impracticable to do so, the landlord shall give the tenant at least 24 hours' notice of the intent of the landlord to enter and may enter only at reasonable times.

"(b)   If repairs or maintenance are requested by the tenant, or entry of the tenant's dwelling unit is necessary to perform repairs or maintenance required for other portions of the premises, except in the case of an emergency or an agreement to the contrary or unless it is impracticable to do so, the landlord or persons acting on behalf of the landlord may enter upon demand or in the tenant's absence until completing the repairs or maintenance, provided:

"(A)   The landlord has given at least 24 hours' notice in writing, specifying the purposes of the entry and the persons who will perform the repairs or maintenance, and stating that those persons are authorized by the landlord to enter upon demand or in the tenant's absence;

"(B)   The entry is for the purposes stated in the notice and by the persons specified in the notice or persons acting under their supervision; and

"(C) The entry occurs at reasonable times."

**GILLETTE, J.,** concurring in part and specially concurring in part.

I join in all of the court's opinion save for its discussion of the "importance" of statutory law. (306 Or 650-651) That material is dicta, unnecessary to the decision or disposition of this case.

More importantly, at least to me, I am not sure that some of the cases relied upon for the discussion were correctly decided. The reasons for my doubts make no difference for the disposition of the present case. It is enough for the moment to note that I am not yet persuaded by this court's opinion in *Shahtout v. Emco Garbage Co.,* 298 Or 598, 695 P2d 897 (1985), and I believe that *Cain v. Rijken,* 300 Or 706, 717 P2d 140 (1986), probably was decided wrongly. My tentative disagreement with the latter and my doubts about the former cause me to be particularly disappointed that the majority sees fit to speak of them here. It will be difficult enough to make headway with respect to them in a case in which their holdings actually are implicated. The task is made that much harder when the cases are recited, in a sort of litany, before it is ever necessary to speak to their pertinence.