Argued and submitted April 12, reversed and remanded November 7, 2007, petition for review denied March 26, 2008 (344 Or 391)

Richard L. WALSH,
*Plaintiff-Respondent,*

*v.*

· SPALDING & SON, INCORPORATED,
an Oregon corporation,
*Defendant-Appellant.*

Josephine County Circuit Court
02CV0187; A126542

171 P3d 1032

Joel S. DeVore argued the cause for appellant. With him on the briefs was Luvaas Cobb.

Dennis H. Black argued the cause for respondent. With him on the briefs was Black, Chapman, Webber, Stevens, Petersen & Lundblade.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant, which leased property to plaintiff's employer, appeals from an adverse judgment entered after a jury found defendant liable for injuries that plaintiff suffered while working on the leased property. On appeal, defendant raises five assignments of error, challenging, *inter alia*, the denial of its motion for a directed verdict and the court's giving of a jury instruction that referred to plaintiff's employer's immunity from suit. As explained below, we conclude that (1) under applicable standards governing the liability of lessors of property to third persons injured on leased premises, defendant was not entitled to a directed verdict; but (2) the instruction referring to plaintiff's employer's (*i.e.*, the lessee's) "immunity" was erroneous and prejudicial. Accordingly, we reverse and remand.[1]

The operative facts for purposes of our review are as follows: Plaintiff worked as a truck driver for United Grocers. In September 1999, defendant leased property that it owned in Grants Pass to United Grocers for use as a truck turn yard. The lease between defendant and United Grocers was for one year. Under the terms of the lease, United Grocers, as lessee, was not to make any alterations or improvements on the premises unless it first obtained defendant's written consent. The parties further agreed that defendant and its agents would have the right to enter into and upon the premises for, *inter alia*, "the purpose of * * * making proper or necessary repairs," so long as such entry would not "unnecessarily interfere with [United Grocers'] use of the premises."

The leased premises consisted of about 45,000 square feet, with an office and a covered shed for parking truck tractors. At its southern end, the property was separated by an embankment, or "drop-off," from a lower and immediately adjacent property also owned by defendant. The vertical difference between the edge of the leased property and the base of the embankment was approximately 16 feet, and five feet down the embankment was a concrete ledge. At

---

[1] Our analysis and disposition obviates the need to address defendant's other assignments of error, which pertain to matters that either may not reoccur following remand or may arise in a materially different posture.

the time the property was leased, there were some railroad ties/beams at the edge of the property to keep material (*e.g.*, wood chips) from falling off the embankment, but the drop-off was not fenced or otherwise guarded.[2]

During the period of United Grocers' tenancy, until May 3, 2000, when plaintiff was injured, United Grocers did not fence or otherwise guard the edge of the embankment; nor did United Grocers erect signs or warnings or delineate where, relative to the embankment, truck trailers should be parked. During that time, drivers employed by United Grocers routinely parked trailers near, and even right against, the edge of the embankment, with the rear doors of the trailers facing the embankment. For his part, plaintiff usually parked leaving 15 to 20 feet between the rear of the trailer and the embankment, because he was aware of the drop-off and the potential hazards that it presented.

On May 3, 2000, plaintiff was at the Grants Pass property preparing to drive a trailer to Portland. The trailer—which someone other than plaintiff had parked— was near the edge of the embankment, with between eight and ten feet separating the rear of the trailer and the drop-off. As part of the pretrip procedures required by United Grocers, plaintiff had to open the trailer and inspect its contents. To reach the rear door of the trailer, plaintiff first had to extend the folded tailgate. However, the tailgate's latching mechanism had been bent in a prior unrelated accident, and plaintiff had to use a hammer to open the latch and lower the tailgate.

Once plaintiff had checked the trailer's load and shut the door, he was unable to reengage the bent tailgate latch. After attempting unsuccessfully to hammer the latch into position, plaintiff retrieved a 15-to-18 inch long metal bar, and, using it as a lever, tried to pry the latch into place. Although plaintiff could have used his truck to pull the trailer forward, away from the ledge, at that point—or, indeed, at any time—he did not do so. The bar slipped loose

---

[2] Prior to leasing the portion of its land to United Grocers, defendant had used this area to store wood chips. Defendant would transport the wood chips from the upper storage area—where United Grocers located its truck yard—to the lower area through tubes, a process aided by the 16-foot drop-off.

on plaintiff's first attempt to bend the latch. Repositioning the bar, plaintiff then exerted more force on the latch—and, again, the bar slipped loose, knocking him off balance.

Plaintiff stumbled backwards, tripped over a beam, and fell over the drop-off, first striking the concrete ledge and then continuing down to the base of the embankment. Plaintiff suffered injuries, including a broken ankle, which required surgery and rehabilitation. Although plaintiff has been able to resume his job as a driver, it is likely that, ultimately, his injury will require that his ankle be fused, which will effectively end his career as a truck driver.

In early 2002, plaintiff filed this action in Josephine County Circuit Court. In his operative amended complaint, plaintiff alleged that his "accident and resulting damages were caused by defendant's negligence" in (1) "failing to place guardrails, fencing or other similar protective barriers" to guard against foreseeable injuries, (2) "creating the dropoff which, given its physical condition, could not be encountered with reasonable safety," and (3) "failing to take corrective measures to ensure that the unreasonably dangerous hazard presented by the dropoff was eliminated."

At trial, as pertinent here, after the close of the evidence, defendant unsuccessfully moved for a directed verdict, arguing that, under applicable standards governing a lessor's liability, the evidence was legally insufficient to support a verdict for plaintiff. Further, defendant unsuccessfully objected to the giving of the following instruction:

"*United Grocers is not a party to this case because under Oregon law United Grocers is immune from liability for negligence, if any, to the plaintiff, Richard Walsh.* * * *

"You may, however, consider the actions of United Grocers as part of the overall circumstances existing at the time of this accident in assessing the plaintiff's claim of negligence against Defendant, Spalding & Son, Inc., in this case.

"You are instructed that if you find the defendant, Spalding & Son, Inc., was negligent and that [its] negligence was a substantial factor in causing the accident in which Plaintiff was injured you may not compare that negligence with any negligence by United Grocers."

(Emphasis added.) The jury awarded plaintiff economic damages of $299,978.46 and noneconomic damages of $425,000, and fixed the parties' comparative fault as 75 percent (defendant) and 25 percent (plaintiff).

Defendant appeals, raising five assignments of error. For the reasons that follow, we conclude that the court did not err in denying defendant's motion for a directed verdict. However, we further conclude that the court committed reversible error in instructing the jury that United Grocers was "immune from liability for negligence." We address each of those matters in turn, beginning with the denial of the directed verdict, which, if erroneous, would result in an outright reversal for defendant.

In reviewing the denial of a motion for directed verdict, we determine whether, viewing the evidence and reasonably derived inferences in the light most favorable to the nonmoving party (in this case, plaintiff), that party adduced legally sufficient evidence to prevail. *See Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003); *Locati v. Johnson*, 204 Or App 633, 635, 131 P3d 779 (2006). Here, defendant contends that, in denying a directed verdict, the trial court applied an erroneously expansive standard of a commercial landlord's liability to its tenant's invitee for injuries resulting from obviously dangerous conditions on the premises that antedated the lease. In particular, defendant asserts that the court incorrectly relied on generalized notions of reasonable foreseeability rather than the more particularized standard of premises liability adopted in *Jensen v. Meyers*, 250 Or 360, 441 P2d 604 (1968), and refined in *Bellikka v. Green*, 306 Or 630, 762 P2d 997 (1988). Defendant further contends that, when tested against the controlling standard of liability, plaintiff's proof was deficient.

The trial court did not err. That is so because, regardless of the precision of the court's identification of the controlling standard—the court observed, without elaboration, that the jury should determine whether "the owner's [defendant's] actions [were] reasonable in the light of all the circumstances"—plaintiff's proof was sufficient under *Jensen* and *Bellikka* to avoid a directed verdict.

In *Jensen*, a young child who was visiting the home of the defendant's tenant was injured when she played with a printing press that the defendant landlord had left in the garage of the leased premises. 250 Or at 361-62. The trial court granted the defendant's motion for a directed verdict, apparently based on the principle stated in section 356 of the *Restatement (Second) of Torts* (1965) that, subject to certain exceptions, "a lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession."

Although the Supreme Court affirmed, it disavowed the proposition that "the mere transfer of a property interest to the lessee" conferred "immunity" from liability on a lessor. *Jensen*, 250 Or at 363. Indeed, the Supreme Court quoted with approval the following observation:

> " '[I]t is no part of the general law of negligence to exonerate a defendant simply because the condition attributable to his negligence has passed beyond his control before it causes injury (if the injury was foreseeable at the time defendant still had control).' "

*Id.* (quoting 2 *Harper & James on Torts* § 27.16, 1510 (1956)).

The Supreme Court proceeded to explore the circumstances in which a lessor could be subject to liability:

> "The exceptions engrafted upon the lessor's immunity from liability appear to be based principally upon the ground that the hazard created by the lessor is not likely to be remedied or immunized by the lessee and thus the lessor is made liable upon the well accepted principle that one is liable for reasonably foreseeable harms."

*Id.* The court further elaborated on a variety of factors indicative of "[t]he unlikelihood of [a] lessee remedying the hazardous condition," including, especially under a short-term lease, circumstances "where the premises are in a ruinous state or where lessor agrees to repair or negligently repairs, or where there is an undisclosed dangerous condition known to the lessor, or where lessor retains control of a part of the leasehold which lessee is entitled to use." *Id.* at 363-64 n 4.

Nevertheless, the Supreme Court ultimately emphasized,

> "this is not to say that the lessor should be liable in every case where a dangerous condition exists at the time of leasing the premises. As one court has expressed it, '* * * the nature of the defect might be such that the landlord would reasonably expect that the tenant would take steps to remedy the defect or otherwise to safeguard persons entering them at his invitation.' "

*Id.* at 363-64 (quoting *Webel v. Yale University*, 125 Conn 515, 524, 7 A2d 215 (1939)). Applying those principles, the court concluded that the mere fact that the defendant could have removed the printing press or otherwise rendered it nonhazardous did not, without more, permit the imposition of liability where the tenant knew of the obvious hazard, could easily have neutralized the danger or warned of the condition, and was in a better position than the landlord to protect invitees. *Id.* at 364-65. Accordingly, "the lessor should not be liable [because] he should be entitled to expect that the lessee will take the necessary steps to eliminate the hazard or warn his guests of the danger." *Id.* at 365.

*Bellikka* was decided shortly after *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987). There, as pertinent here, the issue was "whether a landowner who rents real property to a tenant is liable to a third person injured by a dangerous condition on the rented property known to the landowner at the time of the rental." *Bellikka*, 306 Or at 632. Specifically, the plaintiff was injured when, while accompanying her children who were trick-or-treating, she stepped into a partially concealed hole on property that the defendant had leased to a third party. In her complaint, which included two claims for common-law negligence, the plaintiff pleaded that the hole antedated the defendant's lease to the tenant and that the defendant knew or should have known about that condition. *Id.* at 632-33. The trial court granted the defendant's motion to dismiss pursuant to ORCP 21 A(8), 306 Or at 632, and the Supreme Court reversed the dismissal of, *inter alia*, the negligence claims.

In so holding, the Supreme Court addressed the proper relationship between the *"Fazzolari* trilogy"[3] and *Jensen*. The court framed the inquiry as follows:

> "The question in the present case is not whether *Fazzolari* requires that this court abandon the principles set forth in the Restatement (Second) of Torts § 356. That case does not make principles of common-law negligence apply when they otherwise would not. The question is whether the principles of modern negligence law are in conflict with the traditional rules of landowner liability set forth in the Restatement and, if so, which rules are more properly applied to the present situation?"

*Bellikka*, 306 Or at 639-40. After canvassing the evolution of the law of landowner liability that was synthesized in the *Restatement*, 306 Or at 640-44, and some "[r]ifts in the Restatement's edifice," *id.* at 644-46, the court revisited and ratified *Jensen*'s standard that a lessor is not subject to liability where " 'the nature of the defect might be such that the landlord would reasonably expect that the tenant would take steps to remedy the defect or otherwise to safeguard persons entering [the premises] at his invitation.' " *Id.* at 647 (quoting *Jensen*, 250 Or at 364). The court concluded, "We believe that this is a sound premise for determining liability to 'others on the property' of leased premises." *Bellikka*, 306 Or at 647.

With that legal standard reiterated, the Supreme Court then focused on whether, or in what circumstances, the application of that standard was properly committed to the court, as in *Jensen*, "or whether that issue should be left to the trier of fact." *Bellikka*, 306 Or at 647. On that "court versus jury" question, the Supreme Court emphasized, *"Fazzolari* * * * and related cases become important." *Id.* at 648. While cautioning that *Fazzolari, et al.*, "did not abrogate the court's role in preliminary matters," *id.*, the Supreme Court also observed that, consistently with principles of common-law negligence, the determination of the lessor's liability implicated

---

[3] *See also Donaca v. Curry Co.*, 303 Or 30, 734 P2d 1339 (1987); *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987).

"such questions as whether the defendant unreasonably created a risk of harm to the protected interests of a reasonably foreseeable group or class of people which would include the plaintiff, whether the defendant knew or should have recognized that risk, and whether the defendant acted reasonably in light of the risk created."

*Id.* Those questions, partaking of "reasonableness," are, in turn, generally matters committed to the trier of fact:

"Under most circumstances what is reasonable behavior in a particular set of circumstances, like other uncertain general standards being applied in a particular case, will be a question to be determined by the finder of fact."

*Id.* at 649 n 15.

■ In sum, we understand *Bellikka* to endorse two overarching principles that frame and inform our review. *First*, a commercial lessor is liable in negligence for reasonably foreseeable injuries to invitees of its lessee where those injuries arise from known or reasonably knowable conditions antedating the lease, *unless*, in the totality of the circumstances, including the nature of the potentially hazardous condition and the lessor's opportunity to remedy that condition, the lessor " 'reasonably expect[ed] that the tenant would take steps to remedy the defect or otherwise to safeguard persons entering [the premises] at his invitation.' " *Id.* at 647 (quoting *Jensen*, 250 Or at 364). *See also Coulter Property Management, Inc. v. James*, 328 Or 164, 173, 970 P2d 209 (1998) ("In *Bellikka*, this court reaffirmed the standard set out in *Jensen*" for determining " 'the proper basis of potential liability for landowners with respect to visitors who are on the property at the invitation of the tenant' ") (quoting *Bellikka*, 306 Or at 640).[4] *Second*, "in most circumstances," the

---

[4] *See generally Eduardo v. Clatsop Community Resource*, 168 Or App 383, 391, 4 P3d 83 (2000) ("As [*Jensen*] makes clear, a landlord's exposure to liability for known hazards is based in part on the likelihood that the lessee will remedy the hazard * * * leaving open the possibility that, in cases where the tenant is deemed unlikely to remedy the hazard, the landlord may be liable."); *Mackey v. TKCC, Inc.*, 134 Or App 121, 129, 894 P2d 1200, *rev den*, 321 Or 429 (1995) (*Bellikka*'s ratification of *Jensen*'s standard extends lessor liability under certain circumstances "for the failure to remedy dangerous conditions that it should know about, as well as those it actually knows about.").

determination of the reasonableness of the lessor's conduct—specifically, whether it was reasonable to expect that the lessee would remedy the dangerous condition—is committed to the trier of fact.

Defendant contends that the evidence at trial substantiated compelling reasons for why it could reasonably expect that United Grocers would take necessary and appropriate steps to protect its employees from reasonably foreseeable risks from the drop-off. Defendant emphasizes not only that that condition was patent but also that the lease was commercial, not residential. The latter consideration is especially significant, defendant asserts, because United Grocers, not defendant, controlled its own operations, including what activities, if any, its employees (including plaintiff) might undertake in proximity to the drop-off. Indeed, defendant suggests, to impose some anticipatory obligation to remedy would be to require prescience as to United Grocers' mode of operation. In that regard, defendant reasons, United Grocers not only had the unique ability to identify and implement remedial measures with respect to the drop-off, as necessitated by its operations, but also, given potential workers' compensation and occupational safety regulatory liability, United Grocers had very significant incentive to undertake such measures.

Plaintiff counters that the ultimate determination of the reasonableness of the lessor's expectation that the lessee will undertake repairs involves a variety of factors, including "the time and opportunity to repair defects," *Bellikka*, 306 Or at 647 n 14, and the lessor's retained ability to enter the premises for purposes of inspection and repair. *See, e.g.*, *Jensen*, 250 Or at 363-64 n 4. Plaintiff notes that the term of the lease here was one year, albeit with an option to renew, and that United Grocers could not make any alterations or improvements on the premises without defendant's written approval.

Implicit in plaintiff's response is the proposition that the application of standards of liability that require "mix-and-match" considerations of myriad variables—*e.g.*, obviousness of the condition, nature and magnitude of the risk, opportunity to repair (including as a function of the duration

of occupancy), incentive to repair, potential cost of repair *vis-à-vis* a party's resources, nature and degree of retained control over the property, including with respect to inspection and repair—is seldom, if ever, susceptible *to summary* determination. Explicit in plaintiff's response is the premise that determinations of "reasonableness" are almost invariably consigned to the finder of fact.

Defendant's arguments are provocative. Indeed, if *Jensen* stood alone—if there were no *Bellikka* (and *Fazzolari*)—defendant might well prevail. The circumstances that defendant invokes as substantiating the reasonableness of its expectations here are at least as compelling as those that the Supreme Court held to be sufficient to sustain the directed verdict in *Jensen*. In that regard, we especially appreciate that the lease here was commercial and that plaintiff was the lessee's employee, as opposed to some generic invitee.[5]

But *Jensen* does not stand alone. To be sure, the Supreme Court in *Bellikka* explicitly ratified the correctness of the legal standard of lessor liability adopted in *Jensen*. *See Bellikka*, 306 Or at 647. Yet, even as it did so, the court in *Bellikka*, after referring to the ambient "importan[ce]" of the *Fazzolari* trilogy and then quoting *Jensen*'s formulation of the standard of liability, emphasized that the reasonableness of a party's behavior is ordinarily to be determined by the trier of fact. *Id.* at 649 n 15. The court did not go so far as to disavow its *result* in *Jensen*, but the post-*Fazzolari caveat*, regarding the propriety of directed verdicts under *Jensen*'s "reasonable expectation of lessee repair" formulation, is unmistakable.

■■ We must affirm the denial of the directed verdict "unless there is *no* evidence from which the jury could have found the facts necessary to support the elements of plaintiff's cause of action." *Cole v. Ford Motor Co.*, 136 Or App 45, 49, 900 P2d 1059 (1995) (emphasis added). Here, we cannot

---

[5] *Cf. Wilson v. P.G.E. Company*, 252 Or 385, 398-99, 448 P2d 562 (1969) (referring to the principle that a person who retains independent contractor to perform inherently dangerous work is liable to third parties injured as a result of the independent contractor's failure to undertake precautionary measures but is not liable to the independent contractor's employees).

say that that "no evidence" standard for reversal was satisfied. In particular, given the relatively short duration of United Grocers' occupancy under the lease, defendant's retained ability to enter the property for purposes of inspection and repair, and the lease's prohibition against United Grocers making alterations or improvements on the premises without defendant's express consent, there is, at least, some evidence from which the jury could find that defendant was not reasonably entitled to expect that United Grocers would undertake measures to remedy the potential hazards presented by the drop-off. For example, from the lease terms, the jury could infer—although it was certainly not the only plausible inference—that defendant remained responsible for making "proper and necessary" remedial repairs. Accordingly, the trial court did not err in denying the motion for directed verdict.

We turn then to defendant's assignment of error challenging the instruction that informed the jury that United Grocers was "immune from liability for negligence, if any, to the plaintiff." We will reverse a "judgment * * * on the basis of improper jury instructions when we 'can fairly say that the instructions probably created an erroneous impression of the law in the minds of the jurors which affected the outcome of the case.' " *Howard v. Waremart, Inc.*, 147 Or App 135, 142, 935 P2d 432 (1997) (quoting *Waterway Terminals v. P.S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970)). An instruction can be in error even if it "correctly describes the law if 'the instruction distracts the jury from the appropriate line of analysis.' " *Holger v. Irish*, 316 Or 402, 415, 851 P2d 1122 (1993) (quoting *Honeywell v. Sterling Furniture Co.*, 310 Or 206, 211, 797 P2d 1019 (1990)). We consider the instructions as a whole in assessing the claim of error. *Howard*, 147 Or App at 142.

Defendant argues that the trial court's instructions confused the jury and distracted it from the proper inquiry. Defendant does not dispute that United Grocers was, in fact, immune by virtue of ORS 656.018(1)(a), the workers' compensation "exclusive remedy" provision. Rather, defendant argues that telling the jury "that a non-party is immune from suit is * * * irrelevant and prejudicial," as it suggests an improper legal standard and invites the jury to believe that

defendant is the only available source for plaintiff's recovery. Specifically, defendant asserts:

> "To a defendant, the court telling the jury that a non-party is immune from suit is the same thing as, to a plaintiff, a court telling a jury that a non-party settled for big bucks. * * *
>
> "* * * * *
>
> "The prejudice to [defendant] could not be greater. United Grocers was responsible for supervising Richard Walsh, providing notebooks of safety guidelines, and telling the drivers where and how to park the trailers. A co-employee parked the trailer in question only eight to ten feet from the embankment. United Grocers controlled the site. United Grocers was logically involved in the risk of harm. To tell the jury that United Grocers is immune from suit was to tell the jury that plaintiff's only remedy for his injury was to find [defendant] to blame. * * *
>
> "This prejudice was worse to a defendant than the prejudice to a plaintiff when a jury is told of a settlement. At least a jury might worry that the settlement was insufficient. When a jury is told that United Grocers was wholly immune, the jury believes that plaintiff gets nothing if he leaves the courthouse without a verdict."

Defendant's position is predicated, principally, on *Holger*. Although we have not previously addressed the propriety of informing the jury of a third-party's immunity from liability, we agree with defendant that the circumstances in *Holger* were, in many respects, functionally analogous to those presented here.

In *Holger*, as pertinent here, the plaintiff, as personal representative of the decedent patient, brought a medical malpractice action against a surgeon and a hospital that had employed nurses who assisted in the surgery. 316 Or at 404. Before trial, the plaintiff settled with the hospital. Thereafter, the plaintiff unsuccessfully moved *in limine* to exclude any mention of the settlement with the hospital. *Id.* The trial court denied that motion and "inform[ed] the jury, at the beginning of trial, that there had been a settlement between plaintiff and the hospital," without disclosing the amount of the settlement. *Id.* at 413. The trial court did so

because, given the nature of the plaintiff's allegations, "the jury would 'wonder why the hospital's not involved in the case.'" *Id.* At the same time, the trial court admonished the jury "not to infer from the settlement that [the defendant] is or is not liable to plaintiff. That settlement does not change the issues between the parties." *Id.* (internal quotation marks omitted). Ultimately, the jury returned a verdict for the defendant and, on appeal, the plaintiff argued, *inter alia*, that the trial court had erred in informing the jury that the hospital had settled with the plaintiff. *Id.* at 404-05.

The Supreme Court agreed that the trial court had so erred. *Id.* at 413-15. The Supreme Court began by noting that, under OEC 408, evidence of a compromise is not admissible unless it has "independent relevance." *Id.* at 414. The Supreme Court determined that the information conveyed by the trial court had no independent relevance and that, although it was possible that the jury might have made only "benign" use of that information, there was also a substantial prospect that the extraneous information conveyed in the challenged instruction " 'distract[ed] the jury from the appropriate line of analysis.'" *Id.* at 415 (quoting *Honeywell*, 310 Or at 211). That is, "the jury could have been encouraged to conclude that plaintiff had been compensated fully for the claimed injury[.]" *Id.*; *see also id.* at 420-21 (Unis, J., concurring) ("To inform the jury of plaintiff's settlement with the hospital because the trial court thought that the jury would wonder why the hospital was not a party in the case is incongruent with the instruction that the trial court gave and that we presume the jury followed, *i.e.*, not to base its decision on guesswork, conjecture, or speculation."). Accordingly, the Supreme Court reversed and remanded.[6]

We agree with defendant that the reference to United Grocers' "immunity from liability" in this case implicated—albeit in obverse fashion—the same concerns that compelled reversal in *Holger*. Here, as in *Holger*, the court in

---

[6] The Supreme Court's decision in *Holger* antedated the enactment, in 1995, of ORS 31.605(3) ("The jury shall not be informed of any settlement made by the claimant for damages arising out of the injury or death that is the subject of the action."). Or Laws 1995, ch 696, § 4.

its instruction conveyed extraneous information—information with no "independent relevance"—regarding an ostensibly potentially culpable third party. Here, as in *Holger*, that extraneous information created a substantial prospect that, as a practical matter, the jury "could have been distracted from the appropriate line of analysis." 316 Or at 415. The reference to United Grocers' "immunity from liability" might well have caused jurors to believe, as defendant posits, "that plaintiff's only remedy for his injury was to find [defendant] to blame."[7]

To be sure, it is possible, as it was in *Holger*, that the jury might have made only "benign" use of that information. Further, as plaintiff suggests, the jury could have used the information in a fashion favorable to defendant, *viz.*, "if anything, it would create sympathy for the defendant who is left to be held accountable alone for the type of conduct which United Grocers might be seen to have participated in without sanction." Those scenarios are plausible. But the reality remains that, as in *Holger*, there was also a substantial prospect that the jury made "malign" use of the extraneous information—that is, that its deliberations were improperly skewed in a manner prejudicial to defendant. We thus conclude that the court erred in telling the jury that United Grocers was "immune from liability for negligence" and that, as in *Holger*, that instructional error requires reversal and remand for a new trial.[8]

---

[7] We appreciate, as a practical matter, the trial court's desire to mitigate jurors' curiosity about United Grocers' absence from the case. Nevertheless, because the jury could not be informed that United Grocers had paid workers' compensation benefits to plaintiff, *see, e.g., Bibby v. Hillstrom*, 260 Or 367, 490 P2d 161 (1971), the necessarily unadorned reference to United Grocers' "immunity" was especially misleading.

[8] *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 337 Or 319, 96 P3d 1215 (2004), which plaintiff invokes as supporting the reference to United Grocers' "immunity from negligence," is inapposite. In *Lyons*, the plaintiffs' decedent, an Oregon State Police (OSP) officer, was killed when the vehicle in which he was riding and which was being driven by another officer, Rector, turned in front of a truck driven by one of the defendant's employees. *Id.* at 321-22. Rector and the OSP were both immune from liability under ORS 656.018(1)(a), so the plaintiffs filed an action against the defendant only.

At trial, the court instructed the jury, in part, that Rector and the OSP were "immune from liability for negligence." Neither party objected to that explicit reference to the "immunity" of third persons who were not parties at trial. The trial

Finally, plaintiff, by cross-assignment of error, challenges the trial court's refusal to submit to the jury an alternative theory of premises liability that plaintiff advanced in support of his single claim for relief. We reject that cross-assignment without discussion.

Reversed and remanded.

---

court further instructed the jury, *inter alia*, that it could consider Rector's "actions as part of the overall circumstances existing at the time of this accident in assessing the claims of negligence in this case." *Id.* at 323 (internal quotation marks omitted). In doing so, the court rejected the plaintiffs' contentions that the jury should have been instructed that "it could not consider Rector's conduct unless it were to find that Rector's conduct had been the 'sole and exclusive' cause of the accident." *Id.* The jury returned a defense verdict. That verdict was, in turn, predicated on the jury's negative response to the following special verdict interrogatory:

> "Was defendant WALSH & SONS TRUCKING CO., LTD. negligent in one or more of the ways claimed by the plaintiffs and, if so, was such negligence a cause of damage to the plaintiffs?"

*Id.* (internal quotation marks omitted).

On appeal, the plaintiffs assigned error to the trial court's refusal to instruct the jury that it could consider Rector's conduct only if that conduct was the "sole and exclusive cause" of the accident. We rejected that contention, 183 Or App 76, 51 P3d 625 (2002), and, ultimately, the Supreme Court affirmed on different grounds. Specifically, the Supreme Court concluded that it could not reach the merits of the trial court's purported instructional error because, given the compound nature of the special interrogatory, it was impossible to determine whether the jury verdict for the defendant was based on the "pristine proposition that [the defendant] was not negligent," *id.* at 325, (in which case, the purported instructional error would be immaterial) or on the jury's assessment of causation (which would implicate the purported error). Applying the principle announced in *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 173-74, 61 P3d 928 (2003), the Supreme Court concluded that, because the "[p]laintiffs' claims of error * * * depend on an assumption that the jury's verdict was based on one rationale only," *Lyons*, 337 Or at 326, and because it was impossible to determine which of the two rationales the jury actually adopted, the plaintiffs could not demonstrate that the purported error substantially affected their rights. *Id.*

In sum, nothing in the Supreme Court's opinion in *Lyons* purports to address the propriety of the instructions given in that case—much less to approve the reference to the "immunity from liability" of absent third parties.