Argued and submitted December 9, 2008, summary judgment in favor of
defendants reversed and remanded; otherwise affirmed November 18, 2009

Darrel L. BUOY,
*Plaintiff-Appellant,*

*v.*

Soo Hee KIM
and Enjua Connie Kim,
Trustees of the Kim Trust,
dba Alder Manor Mobile Homes Park;
and Cheralyn Hageman,
*Defendants-Respondents,*

*and*

Sandra McGINNIS;
Jane Doe numbers 1, 2, and 3;
and Angela Gay Archuleta,
*Defendants.*

Clatsop County Circuit Court
062369; A137017

221 P3d 771

H. Richard Sause argued the cause and filed the briefs for appellant.

Matthew J. Kalmanson argued the cause and filed the brief for respondents.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

## SERCOMBE, J.

This case concerns a landlord's liability for harm to a tenant's guest caused by the dangerous condition of a tenant improvement to leased property. Plaintiff was seriously injured when he fell while descending stairs to the entrance of a manufactured dwelling. The dwelling was situated in a leased space in a mobile home park. Plaintiff filed negligence claims against Archuleta, the owner of the mobile home, Soo Hee Kim and Enjua Kim, the mobile home park owners, and Hageman, the park manager.[1] The trial court granted defendants' motion for summary judgment and denied plaintiff's cross-motion for summary judgment under ORCP 47. On plaintiff's appeal challenging both rulings, we view the summary judgment record in a manner most favorable to the party opposing each motion. *Yartzoff v. Democrat-Herald Publishing Co.*, 281 Or 651, 655, 576 P2d 356 (1978). We conclude that the trial court erred in granting summary judgment to defendants.

The following facts are undisputed. Archuleta entered into a "manufactured dwelling space rental agreement" with defendants Kim in April 2004. The month-to-month rental agreement leased a space in the Alder Manor Mobile Homes Park to Archuleta and allowed her to place a manufactured dwelling on the site. The rental agreement obligated Archuleta to complete "skirting, porches, carport and landscaping" improvements by August 1, 2004, and to obtain the lessor's written approval before making improvements to the dwelling or in the space. Those improvements were to comply with "all applicable codes, laws and ordinances." The rental agreement could be terminated if the improvements were not completed in a timely way. Archuleta was further obligated to comply with "Community Rules and Regulations" (park rules) that were attached and incorporated into the agreement, or risk termination of the rental agreement.

---

[1] We refer to defendants Soo Hee Kim, Enjua Kim, and Hageman collectively as "defendants;"Archuleta is not a party to this appeal. The Kims are trustees of the Kim Trust, dba Alder Manor Mobile Homes Park, and, along with Hageman, are referred to as "Alder Manor" in the pleadings. Hageman was employed as the park manager at the time of plaintiff's injuries.

A number of the park rules are relevant:

"1.10   If the Homeowner fails to complete improvements, maintenance or otherwise take some action required by these Rules and Regulations, the Landlord has the option of performing same for the Homeowner and to be fully indemnified for its reasonable expenses including labor, materials and 20 percent of such costs as overhead and supervision fee. * * *

"* * * * *

"3.2   <u>No permanent alterations</u> are to be made to the mobile home or the <u>space without the prior written permission of the Landlord</u> and the <u>building permit from the City of Warrenton</u>.

    "* * * * *

"3.3   All mobile homes, accessories, alterations and additions shall comply with applicable federal, state and local statutes and ordinances as to their construction, installation, and maintenance.

"* * * * *

"3.9   All plans for decks, awnings, carports, garage, and sheds must be approved by the City of Warrenton and by the park management prior to installation and construction.

    "* * * * *

"All decks, porches and steps must have **hand rails**. Homeowner is responsible for staining and maintaining decks, porches and steps.

    "* * * * *

"Awnings and decks must be installed within sixty (60) days following set-up of the mobile home."

(Emphasis in original.)

      Hageman was employed as the park resident manager on July 1, 2004. Hageman's employment contract required her, among other things, to "maintain all the common areas belong[ing] to the park" and to "[e]nforce the park rules, and supervise the tenants to keep the park rules."

Archuleta was tardy in constructing her front porch and stairs. Soon after her employment began, Hageman instructed Archuleta to build a permanent porch and stairs by September 1, 2004. Archuleta submitted plans for those improvements to Alder Manor. Archuleta testified that those plans displayed a porch and stairs that complied with applicable building codes.

Archuleta was experiencing financial troubles and did not build the stairs according to the plans. In August or September of 2004, Archuleta built a porch with stairs that did not have a guardrail or handrail. The riser of the top step was less than four inches in height and was shorter than the riser of the other steps. Those features of the steps and the absence of a guardrail and handrail violated applicable building codes and the provisions of the rental agreement and incorporated park rules that required compliance with state and local laws. The lack of a handrail was also inconsistent with the express directive in the park rules that "porches and steps must have **hand rails**." (Emphasis in original.) Hageman observed the completed stairs but did not instruct Archuleta to add a handrail or otherwise bring the stairs into compliance with park rules or building codes. Hageman stated that she was not familiar with code requirements for the stairs. A city building inspector inspected Archuleta's stairs and instructed her to install a handrail, but Archuleta did not comply.

On August 7, 2005, plaintiff went to Archuleta's home and ascended the stairs to knock on the door and speak with Archuleta. When plaintiff attempted to descend the stairs, he fell and was severely injured. Plaintiff brought a negligence action against Archuleta, the Kims, and Hageman to recover damages for his injuries. All defendants except Archuleta moved for a summary judgment of dismissal of the claims, and plaintiff filed a cross-motion for summary judgment on liability. In their motion, defendants argued that Archuleta, rather than the park owners or manager, was responsible for the condition of the stairs that caused plaintiff's injury and that there was no genuine issue as to any material fact that could create a jury question on their liability.

In a letter opinion, the trial court granted defendants' motion and gave the following reasons:

"In this case, the defect was on Archuleta's manufactured home, and Alder Manor had no knowledge of a dangerous condition. It is reasonable to expect that Archuleta, not the park owner, would remedy the defect or safeguard persons entering her home. Viewing the facts in the light most favorable to Plaintiff, under the rule articulated in *Jensen* [*v. Meyers,* 250 Or 360, 441 P2d 604 (1968),] and *Bellikka* [*v. Green*, 306 Or 630, 762 P2d 997 (1988)], Alder Manor is not liable for Plaintiff's injuries.

"Plaintiff argues that Restatement 2d [of Torts] § 360 applies to this case. § 360 provides that a lessor may be subject to liability caused by a dangerous condition upon that part of the land retained in the lessor's control if the lessor could have discovered the condition and could have made the condition safe. There is no evidence that Alder Manor had control over Archuleta's manufactured home. Although the rental agreement provided that Alder Manor could terminate the agreement if Archuleta did not comply with certain provisions, that was not sufficient control to subject Alder Manor to liability for injuries to Archuleta's visitors."

The trial court denied plaintiff's motion for the same reasons.

On appeal, plaintiff argues that defendants had a duty to protect him from harm for three separate reasons: (1) by entering into Hageman's employment contract, defendants assumed the responsibility to enforce and supervise compliance with the park rules, including the rule requirements to build code-compliant porches and stairs and to construct a handrail for the stairs; (2) defendants were obligated to remedy a known hazard on the leased premises and were negligent in relying on Archuleta to complete and repair the improvements; and (3) defendants exercised substantial supervisory control over the building of the porch and stairs, which were dangerous, and defendants could have made the stairs safe.

Defendants, on the other hand, contend that they had no duty to remedy the condition because they did not know that it violated the building code, the condition arose after commencement of the rental agreement, they properly

relied on Archuleta to repair the stairs, and they lacked physical control over the stairs. Put another way, defendants argue that they are not liable for harm created by a dangerous condition on the leased premises that arises after commencement of the lease unless: (1) they had or assumed physical control over that part of the leasehold, or knew that the condition was unlawful; and (2) it was unreasonable to rely on Archuleta to remedy the hazard. Defendants assert that those predicates to liability do not exist given the undisputed facts in the summary judgment record. The competing claims of the parties require some sorting of the common-law principles that govern the tort liabilities of landlords to tenants and guests of tenants for harm caused on leased premises.

That sorting is no easy task. The Supreme Court recently recognized that "this court's view of the common law in this area has changed over time and that, even taking that evolution into account, our cases may not have been entirely consistent." *Waldner v. Stephens*, 345 Or 526, 535, 200 P3d 556 (2008).

At common law, with certain exceptions, a landlord was immune from liability to a tenant or the tenant's guests for physical harm caused by a dangerous leasehold condition that came into existence after the tenant took possession of the leased premises. The common-law rules are summarized in *Restatement (Second) of Torts* § 355 (1965):

> "Except as stated in §§ 357 and 360-362, a lessor of land is not subject to liability to his lessee or others upon the land with the consent of the lessee or sublessee for physical harm caused by any dangerous condition which comes into existence after the lessee has taken possession."[2]

---

[2] We noted in *McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 612, 152 P3d 918 (2007):

> "[T]he restatements are not part of Oregon law. * * * [H]owever, they are relevant and helpful. One reason for their relevance and utility is that they are descriptive restatements of the law, that is, the drafters' attempts to organize and, in a sense, to codify existing common-law rules. The restatements that describe the duty of landlords to protect tenants * * * are no exception."

(Emphasis in original.) *See also Waldner*, 345 Or at 535 n 9 (*Restatement (Second) of Torts* rules on premises liability are "relevant to the question of a landlord's legal duty to a tenant").

The noted exceptions were under the rules stated in section 357 (lessor contracts in the lease or otherwise to keep the land in repair, a disrepair creates an unreasonable risk that could have been prevented, and the lessor fails to exercise reasonable care to perform the contract), sections 360 and 361 (dangerous condition on part of the land retained in lessor's control and appurtenant to or necessary to safe use of the leasehold where lessor could have discovered the risk and made the condition safe),[3] and section 362 (negligent repairs of leasehold by lessor) of the *Restatement. See also Restatement (Second) of Property* §§ 17.3, 17.4, 17.5, and 17.7 (1977) (stating same rules of liability under restatement of the common law of property). The landlord's liability for post-lease conditions, then, hinged on the landlord's actual or assumed physical control of the leased premises or property associated with the leasehold.

When the dangerous condition arose *before* the property is leased, *i.e.*, when the landlord has actual physical control of the land with the dangerous condition and then transfers possession of the land to a tenant, a broader set of rules operated to define the common-law tort liabilities of a landlord to a tenant or the tenant's guests. Again, as paraphrased in the *Restatement (Second) of Torts* § 356, "[e]xcept as stated in §§ 357-362, a lessor of land is not liable to his lessee or to others on the land for physical harm caused by any dangerous condition, whether natural or artificial, which existed when the lessee took possession." The listed exceptions include those that also apply to the accountability of a landlord for post-lease conditions because of actual or assumed physical control of the leased premises or property associated with the leasehold (§§ 357, 360-62), as well as rules that apply when land is leased for purposes that involve the

---

[3] Section 360 provides:

"A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe."

admission of the public (§ 359) or when there is an undisclosed dangerous condition that is known to the landlord (§ 358).[4] *See also Restatement (Second) of Property* §§ 17.1 to 17.5, 17.7 (stating same rules).

The premises liability standards formulated in the *Restatement (Second) of Torts* have been used by our courts to identify relevant factors to apply in determining the liability of a landlord to tenants or guests of tenants. The standards are a loose fit with Oregon law, and the scope of landlord liability in tort is not confined to just those particulars. The common-law underpinning for landlord immunity for harms caused by conditions on the leased premises was disavowed in *Jensen v. Meyers*, 250 Or 360, 441 P2d 604 (1968). *Jensen* involved a dangerous condition that arose prior to the execution of the lease, harm to a guest of the tenants, and the application of the principles restated in § 356 of the *Restatement (Second) of Torts.* The court noted:

> "The comment appended to Section 356 explains the lessor's non-liability on the ground that 'when the land is leased the law of property regards the lease as equivalent to a sale of land for the term of the lease,' and thus the lessor stands in the same position as the grantor of property who, it is well established, is not liable for injuries occurring after the transfer of title.
>
> "The property concept standing alone is not a satisfactory explanation for immunizing the lessor from liability. As observed in 2 Harper & James, § 27.16 at p. 1506 (1956),

---

[4] Section 358 provides:

"(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or his sublessee for physical harm caused by the condition after the lessee has taken possession, if

"(a) the lessee does not know or have reason to know of the condition or the risk involved, and

"(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk.

"(2) If the [lessor] actively conceals the condition, the liability stated in Subsection (1) continues until the lessee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the [lessee] has had reasonable opportunity to discover the condition and to take such precautions."

198

'it is no part of the general law of negligence to exonerate a defendant simply because the condition attributable to his negligence has passed beyond his control before it causes injury (if the injury was foreseeable at the time the defendant still had control).' "

*Jensen*, 250 Or at 362-63 (footnote omitted).

Instead, the *Jensen* court reasoned that the exceptions to the common-law immunity of a landlord for harm caused by conditions that arose prior to the lease "appear to be based principally upon the ground that the hazard created by the lessor is not likely to be remedied or immunized by the lessee and thus the lessor is made liable upon the well accepted principle that one is liable for reasonably foreseeable harms." *Id.* at 363 (footnote omitted). Relying on *Webel v. Yale University*, 125 Conn 515, 7 A2d 215 (1939), the court articulated the test that "the nature of the defect might be such that the landlord would reasonably expect that the tenant would take steps to remedy the defect or otherwise to safeguard persons entering them at his invitation." *Jensen*, 250 Or at 364 (footnote omitted). Applying that standard, the court concluded that the landlord was not liable under the particular facts of the case because "he should be entitled to expect that the lessee will take the necessary steps to eliminate the hazard or to warn his guests of the danger." *Id.* at 365. *Jensen* substituted a generic factual inquiry—whether a reasonable expectation exists that a tenant would safeguard guests—to assess landlord liability arising from prelease conditions, in place of the immunity and limited exceptions to that immunity that are spelled out in sections 356 and 357 to 362 of the *Restatement (Second) of Torts*.

In *Bellikka v. Green*, 306 Or 630, 762 P2d 997 (1988), the court fleshed out some of the factors that could be used to determine whether an expectation that a tenant would remedy a prelease condition was reasonable. In that case, the injury occurred when a visitor to leased premises stepped into a partially concealed hole that had existed at the time of the lease. The trial court dismissed the guest's complaint against the landlord. In reversing the trial court, the Supreme Court evaluated the legal sufficiency of the pleaded common-law negligence claim.

The court began by noting that "[t]wo specific characteristics of the landlord-tenant relationship must be recognized in this and similar cases: the influence of the landlord's limited control over the premises, and the influence of the [Residential Landlord and Tenant Act, ORS 91.700 to 91.895]." *Id.* at 649. The court reasoned that the common-law immunity of a landlord for harm caused by conditions on leased premises was based on the "landlord's degree of control" and that, although "a landlord cannot rely exclusively on the principles of the Restatement to escape liability, the degree of the landlord's control is an element, of which landlords and the courts should not lose sight." *Id.* According to the court, a landlord's degree of control, and the corresponding reasonableness of relying upon the tenant to remedy a dangerous condition on leased premises, under most circumstances is "to be determined by the finder of fact." *Id.* at 649 n 15. In addition, the Residential Landlord and Tenant Act was important in assessing a landlord's right of access to the leased property, and the resulting "degree of control" by a landlord. The court finally noted that statutory law could also affect the premises liability of a landlord by creating a statutory tort or supporting an element of a negligence claim, including creating a standard of care. *Id.* at 650-51.

We recently summarized the holding in *Bellikka* and the accountability of a landlord to a tenant's employee for harm caused by dangerous conditions that predated the lease in *Walsh v. Spalding and Son, Inc.*, 216 Or App 55, 64-65, 171 P3d 1032 (2007):

> "*First*, a * * * lessor is liable in negligence for reasonably foreseeable injuries to invitees of its lessee where those injuries arise from known or reasonably knowable conditions antedating the lease, *unless,* in the totality of the circumstances, including the nature of the potentially hazardous condition and the lessor's opportunity to remedy that condition, the lessor 'reasonably expected that the tenant would take steps to remedy the defect or otherwise safeguard persons entering the premises.' * * * *Second,* 'in most circumstances,' the determination of the reasonableness of the lessor's conduct—specifically, whether it was reasonable to expect that the lessee would remedy that dangerous condition—is committed to the trier of fact."

(Emphasis in original; citations omitted.)

The *Walsh* rules about landlord liability for injuries that arose "from known or reasonably knowable conditions antedating the lease" apply to conditions that precede a renewal of a periodic tenancy as well. That conclusion follows from the analysis in *Park v. Hoffard,* 315 Or 624, 631, 847 P2d 852 (1993). There, a landlord was held to be potentially liable for injuries to a third party from an attack off the rental property by the tenant's dog. In reaching that conclusion, the Supreme Court applied common-law rules concerning the liability of a landlord for dangerous activities arising after the landlord transfers possession to a tenant, as set out in *Restatement (Second) of Torts* § 379A (1965). That section of the *Restatement* provides for landlord liability in those circumstances if "the lessor at the time of the lease consented to such activity or knew that it would be carried on" and "the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken."

The activity in question in *Park*, the harboring of a dangerous dog, began after the initial commencement of the lease, but before times that the lease was renewed. The court concluded that the landlord was accountable for conditions that existed when the lease was renewed:

> "This action arose because of the special relationship between a landlord and a tenant. That relationship has implications for a landlord's tort liability to persons injured off the rental property by some action or inaction of the tenant to the extent that a landlord has control over the tenant. The landlord's ability to control the activities of the tenant most commonly results from the landlord's ability to decide whether to rent or lease a property to a tenant in the first place, whether to renew a lease or a periodic tenancy, or whether to terminate a tenancy at will or other tenancy that the landlord is able to terminate unilaterally."

315 Or at 631-32. Accordingly, the court found the landlord could be liable under the precepts set out in *Restatement (Second) of Torts* § 379A when

> "(1) the landlord, at the time of entering into a lease, at the time of renewing a lease or a periodic tenancy, or at any time during a tenancy at will or other tenancy that the landlord is able to terminate unilaterally, consents to such

activity or knows that it will be carried on, and (2) the landlord knows or has reason to know that the activity will unavoidably involve an unreasonable risk of harm to persons off the rental property."

*Id.* at 632.

■ We perceive no meaningful distinction between the legal effect of a landlord's "degree of control" of a dangerous *activity* at the time of lease renewal and a landlord's control over a dangerous *condition* at that time and conclude that the common-law rules governing a landlord's liability for injuries from known or reasonably knowable conditions antedating the lease applies to conditions that precede a renewal of a periodic tenancy as well. Given that conclusion, the trial court erred in granting summary judgment to defendants.[5]

■ Defendants renewed Archuleta's rental agreement each month between the construction of the stairs in August or September 2004 and the injuries to plaintiff in August 2005. At the time of each renewal of the rental agreement, defendants knew of the potential hazard created by the lack of a handrail. Defendant Hageman testified that she saw the newly constructed stairs and porch. The lack of a handrail was plainly visible. Issues of material fact existed regarding whether defendants should have known of the step riser and lack of guardrail defects in the porch structure, given the earlier submission to them of code-compliant building plans and the plainly defective construction of stairs without a handrail. Defendant Hageman testified that she was not aware of the building code violations. It is, however, defendants' knowledge that dangerous conditions exist (the lack of a handrail and the variances from the submitted plans) that is probative and not necessarily defendants' knowledge of the legal significance of those defects.

Moreover, defendant Hageman was commissioned by defendants Kim to "[e]nforce the park rules, and supervise

---

[5] Because we conclude that the common-law rules for landlord liability for conditions preceding the lease apply to conditions arising during the periodic tenancy in this case, we need not decide if the same analytic framework applies to landlord liability arising out of conditions occurring after commencement of the lease. *See Park v. Hoffard*, 111 Or App 340, 826 P2d 79 (1992), *aff'd as modified*, 315 Or 624, 847 P2d 852 (1993) (so concluding).

the tenants to keep the park rules." Those park rules required that additions to the mobile homes comply with applicable "state and local statutes and ordinances as to their construction, installation and maintenance." Defendant Hageman was aware that Archuleta was building a porch and stairs that were subject to the state building code. As earlier noted, the park rules expressly require that "all * * * steps must have **hand rails**." (Emphasis in original.) We conclude that there is sufficient evidence in the summary judgment record to create jury questions on whether defendants knew or should have known of the dangerous condition of the steps.

■ As the court held in *Walsh*, the reasonableness of the landlord's conduct—whether it was reasonable to expect that the tenant would remedy the dangerous condition—is usually an issue for the trier of fact. This case is no different. The circumstances that suggest a high degree of landlord control over the proper construction of the steps include requirements of Archuleta in the rental agreement to (1) obtain landlord's "prior written approval" for improvements to the exterior of the manufactured dwelling; (2) construct improvements, including porches, "in a workmanlike manner and in compliance with all applicable codes, laws and ordinances"; (3) allow termination of the rental agreement by defendants if Archuleta failed to timely construct the required porches; and (4) incorporate park rules that separately require the landlord's written approval of permanent alterations to the mobile home, compliance with applicable state and local laws on construction, installation, and maintenance of improvements, and allowing that, "[i]f Homeowner fails to complete improvements, maintenance or otherwise take some action required by these [park rules] the Landlord has the option of performing same for the Homeowner and to be fully indemnified for its reasonable expenses * * *." That context, together with the facts that defendant Hageman directed Archuleta to make the porch improvements and received code-compliant plans for the improvements, create jury issues on the degree of landlord control over the stairs to Archuleta's manufactured dwelling.

■ Similarly, a jury issue exists on whether defendants should have expected Archuleta to repair the stairs.

Archuleta constructed the stairs without complying with the submitted plans. She maintained the stairs in open disrepair, without a handrail, for over 10 months. Defendants knew Archuleta was short of funds. Defendants presented no evidence that any change in Archuleta's behavior was imminent.

We recognize that typically a landlord in a mobile home park has less degree of control and greater expectation of tenant repair of a structure that the tenant owns, the manufactured dwelling, than is the case when the dwelling itself is owned and leased by the landlord. Our decision sets no rule of conduct for mobile home park owners and managers. We conclude only that a jury question is presented on the reasonableness of defendants' conduct under the facts of this case. As stated in *Walsh,* the determination of whether defendants acted reasonably in not repairing the stairs should be left to the factfinder, because the " 'mix-and-match' considerations of myriad variables—*e.g.*, obviousness of the condition, * * * opportunity to repair, * * * potential cost of repair *vis-à-vis* a party's resources, nature and degree of retained control over the property * * * is seldom, if ever, susceptible to summary determination." 216 Or App at 65-66. The trial court erred in granting summary judgment to defendants on plaintiff's negligence claims.[6]

Plaintiff's remaining contentions on appeal concern the relevance of two facts—the contractual obligation of defendant Hageman to defendants Kim to "[e]nforce the park rules, and supervise the tenants to keep the park rules" and the existence of building code violations by the constructed stairs—to the negligence analysis in the case. Although both factors are relevant in the negligence equation, neither factor alone compels the conclusion that defendants breached a standard of care owed to plaintiff. Thus, the trial court did not err in denying plaintiff's motion for grant summary judgment on the issue of defendants' liability in tort.[7]

---

[6] Hageman did not contend that there were bases for dismissing plaintiff's tort claims against her other than those asserted on behalf of all of the defendants.

[7] "In an appeal from a judgment that results from cross-motions for summary judgment, if both the granting of one motion and the denial of the other are assigned as error, then both are subject to review." *Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002) (citation omitted).

■        Defendant Hageman's contractual obligations to defendants Kim may or may not create a duty to guests at the mobile home park as third-party beneficiaries of that contract. *See Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987). Any such contractual duty does not create a standard of care that can be enforced in a tort action. We recently observed in *Abraham v. T. Henry Construction, Inc.*, 230 Or App 564, 568, 217 P3d 212 (2009), that a breach of contract does not establish liability in tort: "For the injured party to have a tort claim, however, that party must allege the breach of a standard of care that is independent of the contract and without reference to its specific terms." (Footnote omitted.) Defendant Hageman's contractual duties may be relevant to establishing defendants' "degree of control" over Archuleta's porch and stair improvements under *Bellikka* and defendants' "opportunity to remedy" the dangerous condition under *Walsh*. But any breach of those duties does not establish defendants' negligence as a matter of law.

■        Nor is that negligence established in this case by the continued existence of stairs constructed in violation of applicable building code provisions. To establish a negligence *per se* claim, plaintiff must prove that "(1) defendants violated a statute [or rule]; (2) that plaintiff was injured as a result of that violation; (3) that plaintiff was a member of the class of persons meant to be protected by the statute [or rule]; *and* (4) that the injury plaintiff suffered is of a type that the statute [or rule] was enacted to prevent." *McAlpine v. Multnomah County*, 131 Or App 136, 144, 883 P2d 869 (1994), *rev den*, 320 Or 507 (1995) (citations omitted).

        Plaintiff does not identify a relevant statutory or administrative rule violation by defendants for purposes of a negligence *per se* claim. Some building code regulations have been interpreted to create ongoing duties by an owner of a dwelling or other structure. *Lapp v. Rogers*, 265 Or 586, 510 P2d 551 (1973) (owner/landlord liable to tenant in negligence for failure to provide handrail in violation of building code ordinance). Defendants, of course, are not the owners of Archuleta's manufactured dwelling. We are not aware of the direct application of building code regulations of manufactured dwellings to the owners of the land occupied by the structure. *See* ORS 446.111 (obligation of mobile home park

operator to advise tenant or manufactured dwelling builder of applicable standards); ORS 446.155 (application of sanitary and safety requirements to sellers of manufactured dwellings); ORS 446.062 and OAR 918-500-0020 (adoption of Oregon Manufactured Dwelling and Park Specialty Code (2002 ed)). The failure of the constructed stairs to comply with building code requirements is relevant to establishing the "nature of the potentially hazardous condition" under *Walsh*. But the code violations were not committed by defendants and do not support a negligence *per se* claim.

Summary judgment in favor of defendants reversed and remanded; otherwise affirmed.